## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| IN RE:<br><br>SKLAR EXPLORATION COMPANY, LLC,<br>EIN:  72-1417930<br><br>     Debtor. | Case No. 20-12377-EEB<br><br>Chapter 11 |
| SKLARCO, LLC,<br>EIN:  72-1425432<br><br>     Debtor. | Case No. 20-12380-EEB<br><br>Chapter 11 |
| THOMAS M. KIM, AS CREDITOR TRUSTEE<br>OF THE SKLARCO CREDITOR TRUST,<br><br>     Plaintiff,<br><br>v.<br><br>HOWARD F. SKLAR, INDIVIDUALLY;<br>MIRIAM SKLAR, L.C.; HOWARD F. SKLAR<br>AS INDEPNDENT EXECUTOR OF THE<br>SUCCESSION OF MIRIAM MANDEL SKLAR;<br>AND HOWARD F. SKLAR AS TRUSTEE OF<br>THE HOWARD TRUST, THE ALAN<br>GRANTOR TRUST, AND THE JACOB<br>GRANTOR TRUST<br><br>     Defendants. | Adversary No. _____-EEB |

## ORIGINAL COMPLAINT

Thomas M. Kim, solely in his capacity as Creditor Trustee (the "Trustee") of the Sklarco

Creditor Trust, (the "Trust"), files this Original Complaint against Howard F. Sklar, Individually

("Howard"), Miriam Sklar, L.C. ("Miriam"), Howard F. Sklar, Independent Executor of the

Succession of Miriam Mandel Sklar ("SMMS"), and Howard F. Sklar, in his capacity as Trustee

for each of the Howard Trust (the "Howard Trust"), the Alan Grantor Trust (the "Alan Trust"),

and the Jacob Grantor Trust (the "Jacob Trust" and collectively with Miriam, SMMS, the Howard Trust, and the Alan Trust, the "Family Trusts", and collectively with Howard, "Defendants") and, in support thereof, alleges as follows:

## Preliminary Statement

1.    From all outward appearances right up until commencement of these bankruptcy cases, Howard Sklar was an extremely successful businessman and CEO of two profitable companies, Sklarco and SEC.  He flew friends and family on his private jet to Napa, Las Vegas, up and down the California coast, and elsewhere.  He owned prized show dogs that he paid to travel throughout the country in a private motorcoach.  He was an investor and driver in a professional race car team, and he owned a $1.4 million condominium in Boulder, Colorado.  As the sole owner and CEO of Sklarco and SEC, Howard answered to nobody but himself, and he used that control to shower himself with cash, sometimes as much as $2 million per year, all withdrawn from company accounts.

2.    A closer look at Sklarco's and SEC's finances, however, tells a much different story.  Rather than being hugely profitable and wildly successful oil and gas companies, Sklarco and SEC were operating on razor-thin margins due to Howard's mismanagement and malfeasance.  As an oil and gas operator, SEC's business was dependent on working interest owners reimbursing SEC for the expenses it incurred to operate the wells.  Howard and his management team were diligent at pursuing third-party working interest owners for payment of their expense reimbursements, but when it came to the expense reimbursements that Howard and his family owed, he simply let them slide.

3.    Defendants' failure to remain current on their expense reimbursement obligations blew a $36 million hole in Sklarco's and SEC's finances, yet Howard continued to use his power

over both companies to direct millions of dollars of transfers to himself and his family.  That cash had to come from somewhere, so in the period leading up to the Petition Date, Howard oversaw the decision to convert millions in funds held by SEC that were earmarked for specific well projects, and millions more in well revenues that were owed to third party working interest owners, and use them instead to fund general operating expenses.  With those funds, Howard paid himself and his sons over $2.7 million in 2019 alone, while using company funds to pay for luxury private jet flights and to purchase exclusive golf club memberships.  Howard did this, all the while knowing that SEC was slow-paying vendors who were critical for SEC's ability to continue operating.

4.      When the end finally came, the damage done by Howard's malfeasance and mismanagement was clear:  the Family Trusts that Howard controlled owed over $36 million to Sklarco, and SEC's creditors were owed over $57 million.  All the while Howard and the Family Trusts walked away with over $10.3 million in the four years leading up to the Petition Date.  Through this adversary proceeding, the Trust seeks to recover the amounts that Defendants wrongfully took from Sklarco and SEC, in order to provide some compensation for the losses SEC's and Sklarco's creditors suffered.

## Parties

5.      Plaintiff Thomas M. Kim, as Trustee of the Sklarco Creditor Trust, was appointed pursuant to that certain Creditor Trust Agreement, which was approved by the Bankruptcy Court pursuant to its August 24, 2021, Order Confirming Second Amended and Restated Plan of Reorganization dated December 18, 2020, as amended. (the "Confirmed Plan")  Pursuant to the Confirmed Plan, the Sklarco Creditor Trust was vested with the sole right to pursue all Causes of

Action (as such term is defined in the Confirmed Plan) on behalf of the creditors of Sklarco and SEC.

6.      Defendant Howard F. Sklar, individually, ("Howard") is an individual who is currently residing in Boulder, Colorado.  Howard F. Sklar, individually, may be served with process through his attorney of record, Adam L. Hirsch, Davis Graham & Stubbs, 1550 17th Street, Suite 500, Denver, CO 80202.

7.      Defendant Miriam Sklar L.C. ("Miriam") is a Louisiana limited liability company, whose manager is Howard F. Sklar.  Miriam Sklar L.C. may be served through its registered agent, Malcolm S. Murchison, 401 Edwards Street, Suite 1000, Shreveport, Louisiana, 71101.

8.      Defendant Succession of Miriam Mandel Sklar ("SMMS") is a Louisiana probate estate created pursuant to that certain order dated April 21, 2010, of the First Judicial District Court, Caddo Parish, Louisiana, Suit No. 540336-B.   SMMS may be served through its independent executor, Howard F. Sklar, through his attorney of record, Adam L. Hirsch, Davis Graham & Stubbs, 1550 17th Street, Suite 500, Denver, CO 80202.

9.      Defendant Howard Trust is an irrevocable inter vivos trust created under the laws of the State of Louisiana ("Howard Trust").  Howard Trust may be served through its trustee, Howard F. Sklar, through his attorney of record, Adam L. Hirsch, Davis Graham & Stubbs, 1550 17th Street, Suite 500, Denver, CO 80202.

10.      Defendant Alan Grantor Trust is an irrevocable inter vivos trust created under the laws of the State of Louisiana ("Alan Trust").  Alan Trust may be served through its trustee, Howard F. Sklar, through his attorney of record, Adam L. Hirsch, Davis Graham & Stubbs, 1550 17th Street, Suite 500, Denver, CO 80202.

11.     Defendant Jacob Grantor Trust is an irrevocable inter vivos trust created under the laws of the State of Louisiana. ("Jacob Trust").  Jacob Trust may be served through its trustee, Howard F. Sklar, through his attorney of record, Adam L. Hirsch, Davis Graham & Stubbs, 1550 17th Street, Suite 500, Denver, CO 80202.

12.     Defendants Howard Trust, Miriam, SMMS, Jacob Trust, and Alan Trust are collectively referred to herein as the "Family Trusts".

## Jurisdiction and Venue

13.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure ("FRBP").  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Pursuant to FRBP 7008, the Trustee consents to the entry of final orders or judgment by this Court in connection with this adversary proceeding in the event it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

14.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background Facts

**Howard's Numerous and Often Conflicting
Obligations and Fiduciary Duties**

15.     Howard founded SEC in 1998, and he was the sole owner (through the Howard Trust) and CEO/Manager of SEC at all relevant times up until commencement of SEC's chapter 11 case.  As the CEO and Manager of SEC, Howard owed various obligations and fiduciary duties to SEC, including the duties of care, loyalty, and good faith.

16.     SEC was created to be an oil and gas operating company.  SEC owned no oil and gas interests itself; rather, SEC was hired by the owners of oil and gas interests – the working interest owners – to develop and market those interests.  As the operator, SEC's business model

was to charge the working interest owners their proportionate share of the costs to drill, complete, operate, and maintain the wells, and to distribute revenue generated by the wells back out to those working interest owners.  In exchange for providing that service to the working interest owners, SEC charged the working interest owners various fees which were designed to cover SEC's overhead costs.

17.     In that respect, SEC's business model was simple – for every expense it incurred in operating the working interest owners' wells, there was to be a reimbursing payment from those working interest owners.  As such, SEC's success was completely reliant on those working interest owners to reimburse their fair share of the expenses of developing, operating, and maintain their wells.  Without those regular expense reimbursements, SEC's finances would quickly go into the red.

18.     Howard founded Sklarco in 1998, and he was also the sole owner (through the Howard Trust) and CEO/Manager of Sklarco at all relevant times up until commencement of Sklarco's chapter 11 case.  As the CEO and Manager of Sklarco, Howard owed various obligations and fiduciary duties, including duties of care, loyalty, and good faith.

19.     Sklarco was created, in part, to own various oil and gas working interests on behalf of members of the Sklar family (collectively, the "Sklar Family Working Interests").  Sklarco had no employees or business of its own – its sole purpose was to own and manage the Sklar Family Working Interests and other Sklar family investment interests.  Sklarco contracted with SEC to operate the Sklar Family Working Interests, and as such Sklarco was responsible for making regular expense reimbursement payments to SEC, just as the numerous other non-Sklar working interest owners that contracted with SEC were required to do.

20.    Howard also acted as the sole trustee for the various trusts and estates that he established for himself and his family.  Specifically, Howard appointed himself trustee of the Howard Trust, and as such he owed various obligations and duties to the beneficiary of the Howard Trust – namely, himself.

21.    Howard also appointed himself as the sole trustee of the Jacob Trust.  In his capacity as trustee of the Jacob Trust, Howard owed various obligations and duties to the beneficiary of that trust, his son Jacob.

22.    Howard also appointed himself as the sole trustee of the Alan Trust.  In his capacity as trustee of the Alan Trust, Howard owed various obligations and duties to the beneficiary of that trust, his son Alan.

23.    Howard also served as manager of Miriam Sklar L.C.  In his capacity as manager of Miriam Sklar L.C., Howard owed various obligations and duties to Miriam.

24.    Howard also served as Independent Executor of the Succession of Miriam Mandel Sklar, which is the successor to the probate estate of Howard's mother, Miriam Mandel Sklar.  In his capacity as independent executor of the Succession of Miriam Mandel Sklar, Howard owed various obligations and duties to SMMS.

25.    The various managerial and trustee roles Howard fulfilled for SEC, Sklarco, and the Family Trusts led to inherent conflicts of interest.  For example, when the Family Trusts failed for years to make their required expense reimbursement payments to Sklarco, instead of pursuing collection efforts, Howard chose instead to forgo collection, thereby significantly benefitting himself and his family's finances while substantially impairing both SEC's and Sklarco's financial health.  As discussed below, it was Howard's decision to put his and his family's interests above

7

those of Sklarco and SEC that ultimately doomed those companies to bankruptcy, leaving SEC's substantial trade vendors and working interest owners holding the bag.

**The Agency Services Agreement**

26.     The Family Trusts each contracted with Sklarco to own and manage the Sklar Family Working Interests.  In turn, Sklarco contracted with SEC to operate those working interests. The agreement between the Family Trusts, Sklarco, and SEC was called the Agency Services Agreement (the "ASA").  The ASA was executed on July 2, 2010, and thereafter amended on August 31, 2015.[1]  True and correct copies of the ASA and the First Amendment to the ASA are attached hereto as **Exhibits A** and **B**, respectively.

27.     Prior to July 2, 2010, the Sklar Family Working Interests were operated by Sklarco and SEC pursuant to an earlier agreement, referred to as the "Prior Agency Services Agreement". The Prior Agency Services Agreement was executed on December 14, 2007.

28.     Pursuant to the ASA, the Family Trusts granted Sklarco authority to own and manage all aspects of the Sklar Family Working Interests.  *See* ASA, § 1.1, *et seq.*  As part of that grant of authority, the Family Trusts authorized Sklarco to incur expenses for operation and development of the Sklar Family Working Interests (collectively, the "Sklar Family JIB Expenses"), and Sklarco agreed to pay those Sklar Family JIB Expenses to SEC on behalf of the Family Trusts.  *See* ASA, § 2.1.

29.     As compensation for owning and managing the Sklar Family Working Interests, the ASA required the Family Trusts to pay certain fees to Sklarco on a monthly basis (collectively, the "Agency Services Fees").  *See* ASA, § 2.1, *et. seq.*

---

[1]     The ASA was amended a second time in connection with these chapter 11 proceedings, but that amendment specifically carved out and preserved the claims that are brought in this adversary proceeding.

30.      Sklarco was required to bill each of the Family Trusts on or before the 20th of each month for each Family Trust's share of the Sklar Family JIB Expenses and the Agency Services Fees, and each Family Trust was required to pay such charges to Sklarco within 15 days of receiving that bill.  *See* ASA, § 2.1.  To keep track of those bills and payments, Sklarco established what it referred to as the O&G Intercompany Account (the "Intercompany Account").

31.      The procedures set forth in the ASA and the prior Agency Services Agreement for billing the Sklar Family JIB Expenses and Agency Services Fees on a monthly basis to the Family Trusts were intended, in part, to ensure that Sklarco always had sufficient funds on hand to compensate SEC for the costs of operating and managing the Sklar Family Working Interests. However, that was not always how the Intercompany Account operated, both before and after the ASA was executed.

32.      When the ASA was executed on July 2, 2010, the Family Trusts (and their predecessors) had already run up over $18 million in unpaid Sklar Family JIB Expenses and Agency Services Fees owed to Sklarco under the Prior Agency Services Agreement.  Specifically, as of July 2, 2010, the Intercompany Account reflected that the Family Trusts owed Sklarco the following amounts:

| | |
|---|---|
| Howard Trust | $10,249,544.04 |
| SMMS/Miriam Sklar L.C. | $7,100,540.98 |
| Alan Trust | $326,693.11 |
| Sam Trust (predecessor to Jacob Trust) | $488,259.39 |
| **TOTAL DEBT** | **$18,165,037.52[2]** |

The ASA required the Family Trusts to make monthly payments to pay down the $18.1 million existing Intercompany Account debt, and those payments were to be in addition to the current

---

[2]      The $18.1 million in unpaid Sklar Family JIB Expenses as of July 2, 2010, is *net* of any revenues from the Sklar Family Working Interests that were left in SEC.

charges that would be billed to the Intercompany Account for Sklar Family JIB Expenses and Agency Services Fees owed by the Family Trusts. *See* ASA, § 2.4.

33.     All amounts owed by the Family Trusts to Sklarco as reflected in the Intercompany Account that remain outstanding and unpaid beyond the deadlines set forth in the ASA bear interest until the obligation is paid. *See* ASA, § 2.6. The interest rate is set at the then-applicable prime rate plus 1%. *See id.*

34.     Under Howard's management and control, the Family Trusts never meaningfully attempted to pay down the Intercompany Account. Rather, after the ASA was executed on July 2, 2010, Howard and the Family Trusts that he controlled simply continued to rack up unpaid Sklar Family JIB Expenses and Agency Services Fees, all the while withdrawing substantial sums from Sklarco and SEC which Howard characterized as "salary" and "distributions". As a result, the Intercompany Account reflected that the Family Trusts owed more than $36 million to Sklarco, and that Sklarco owed SEC over $35 million,[3] as of the April 1, 2020, bankruptcy filing (the "Petition Date").[4]

**Howard Used Sklarco and SEC to Fund His
Lavish Lifestyle**

35.     When the ASA was executed in 2010, the price for West Texas Intermediate Crude was hovering in the range of $80 per barrel, and for the next four years the price remained above $90 per barrel. At that price, SEC and Sklarco were generating substantial revenues from the sale of oil and gas production, and Howard was living large. In 2012 and 2013, Howard caused SEC

---

[3]     Again, the $36 million that was owed by the Family Trusts to Sklarco on the Petition Date, and the $35 million that was owed by Sklarco to SEC on the Petition Date, are both *net* of any Sklar Family Working Interest revenues that were left in the companies.

[4]     Inexplicably, the Schedules of Assets and Liabilities that Howard authorized Sklarco and SEC to file shortly after the Petition Date say nothing about the debts the Family Trusts owes to Sklarco, or the debts that Sklarco owes to SEC.

to lease a $9 million private jet for both business and his personal use.  That same year, Howard rang up over $50,000 in expenses for his show dogs, he invested and raced in a race car team, and he purchased a $1.45 million luxury condominium in Boulder, Colorado.

36.     That lifestyle was threatened in 2015, when the price of West Texas Intermediate Crude fell to approximately $50 per barrel.  In 2016, it dropped even further to less than $40 per barrel.  In response, Howard directed SEC to sell the corporate jet, and he suspended his "salary".  Nevertheless, Howard continued to withdraw cash from Sklarco for himself and the Family Trusts, aided by significant cash transfers from SEC to Sklarco.  In the 21 months from April 1, 2016, to December 31, 2017, Howard and the Family Trusts withdrew over $5 million from Sklarco and SEC – an average of $238,000 *per month*.  During this same timeframe, the amount of the unpaid Sklar Family JIB Expenses and Agency Services Fees owed to Sklarco as reflected on the Intercompany Account exceeded $20 million, and the debt Sklarco owed to SEC on behalf of the Family Trusts increased to over $22 million.

37.     In 2018 the price of oil slightly recovered to approximately $65 per barrel and Howard was feeling flush with cash again.[5]  That year, Howard reinstated his salary, this time paying himself $500,000 per year, plus distributions to the Howard Trust totaling over $1.5 million.  Nevertheless, Howard continued to neglect the mounting debts the Family Trusts owed to Sklarco, and that Sklarco owed to SEC.  By the end of 2018, the unpaid Sklar Family JIB Expenses and Agency Services Fees owed to Sklarco as reflected on the Intercompany Account, and the debts Sklarco owed to SEC, exceeded $30 million.

---

[5]     Sklarco and SEC also closed on a $50 million credit facility with East West Bank on June 15, 2018.  Within 6 months of taking out that loan, Howard paid himself $635,500, and distributed an additional $557,435 to the Family Trusts.

38.     In 2019 the price of oil dropped to approximately $55 per barrel, and it never recovered above that price before the Petition Date.  That drop significantly impacted SEC's operations, and without the much-needed expense reimbursements and Agency Services Fees due from the Family Trusts, SEC found itself struggling to find sufficient cash flow to pay its bills. For example, on April 1, 2019, Rapad Drilling Company billed SEC almost $560,000 for work that it performed on SEC-operated wells.  Payment was due on that invoice in May 2019, but instead of paying the invoice, SEC management discussed "how far out can we push Rapad?"

39.     SEC would have had sufficient funds to timely pay Rapad and other critical vendors were it not for Howard's repeated decision to put his own personal interests ahead of the companies'.  For example, while SEC was struggling to pay Rapad and other critical vendors in 2019, Howard was using SEC and Sklarco to pay himself $130,000 in salary *per month*, or $1.56 million per year.  When SEC's bank lender found out about the exorbitant "salary" that Howard had awarded himself, Howard agreed to "reduce" his salary to $500,000, while at the same time directing SEC's accountants to recharacterize the remainder of his $1.56 million "salary" as distributions to equity.

40.     According to Howard, when he wanted to take cash out of Sklarco or SEC, he would speak to the CFO[6] to make the withdrawal request.  Howard was the top manager at both Sklarco and SEC, and he owned 100% of both companies.  It is thus understandable that, as far as Howard can recall, his CFO never said "no" when Howard asked for money.  Sklarco's financial records support Howard's recollection that whenever he asked for cash, he got it:  in the four years leading up to the Petition Date, Howard withdrew over $8.6 million in cash from Sklarco and SEC solely for himself – an average of $180,000 *per month* (collectively, the "Howard Four-Year

---

[6]      It appears that SEC had at least three different CFOs in the years leading up to the Petition Date.

Distributions"). Each of the Howard Four-Year Distributions is set forth on **Exhibit C**, attached hereto.

41.     Howard also used his CEO position at Sklarco and SEC to enrich the Family Trusts. In the four years before the Petition Date, Howard transferred over $1.7 million in cash collectively to the Alan Trust (collectively the "Alan Four-Year Distributions"), the Jacob Trust (collectively, the "Jacob Four-Year Distributions"), and SMMS (collectively, the "SMMS Four-Year Distributions"). Details of the Alan Four-Year Distributions, the Jacob Four-Year Distributions, and the SMMS Four-Year Distributions are set forth on attached **Exhibits D, E, and F**, respectively.

42.     Howard didn't just use his CEO titles and ownership to shower himself and his family with cash while SEC was struggling to pay its bills; he also used the companies to directly fund his own personal expenses and those of his senior managers at SEC. For example, in March of 2019, SEC paid more than $28,000 to the Omni Interlocken Golf Club for golf club memberships for SEC management.[7] That same year, under Howard's CEO leadership which he characterized as "everyday decision-making at the company," SEC booked more than $400,000 in private charter jet flights for senior SEC management, including personal trips for Howard to Napa, Las Vegas, Portland, and San Diego.

43.     Also under Howard's "day-to-day" management in 2019, he allowed the Family Trusts to rack up an additional $4.8 million in unpaid Sklar Family JIB Expenses and Agency Services Fees, bringing the total they owed to Sklarco according to the Intercompany Account to

---

[7]     Incredibly, Howard allowed SEC's senior management to use over $28,000 in SEC funds to renew those golf club memberships on February 24, 2020, 5 weeks before the Petition Date. While they were spending scarce company funds on golf club memberships, Howard and SEC management were slow-paying trade vendors and engaged in workout negotiations with SEC's primary secured lender, East West Bank.

approximately $35 million as of December 31, 2019.  As of that same date, Sklarco's unpaid debts to SEC totaled approximately $34 million.

44.     The strain on SEC's cash flow caused by decreased revenues due to falling oil prices, Howard's failure to pursue repayment of the unpaid Sklar Family JIB Expenses and Agency Services Fees, plus Howard's push to take more and more cash out of the companies to fund his personal expenses, worked a significant hardship on SEC in 2019.  So much so that, under Howard's management and control, SEC began converting working interest owner cash call funds that were earmarked for specific capital improvement projects, and directed them instead towards SEC's general operations.  According to the debtor's chapter 11 counsel, as of the Petition Date approximately $7 million in funds that were earmarked for specific projects had been diverted to SEC's general operating account (the "Cash Call Funds").[8]  Howard and his management team at SEC also withheld approximately $4.4 million in revenues that were owed to third-party working interest owners in the months immediately before the Petition Date, diverting those revenues into SEC's general operating account (the "Unpaid Working Interest Revenues").

45.     As CEO and Manager of Sklarco and SEC, Howard owed fiduciary duties to both Sklarco and SEC, including the duty to put the interests of Sklarco and SEC above his own personal interests.  Those fiduciary duties also required Howard to establish financial controls at SEC to ensure that the Cash Call Funds were used solely for the capital projects for which they were paid by the working interest owners, that the Unpaid Working Interest Revenues were segregated and paid to their rightful owners, and to ensure that those funds were used for their intended corporate purposes.  Howard breached those fiduciary duties and exposed SEC to unnecessary liability by

---

[8]        When asked in his Rule 2004 examination to explain how the Cash Call Funds were used, Howard blithely answered that "cash is fungible".

redirecting the Cash Call Funds and the Unpaid Working Interest Revenues to general operating accounts so he could continue transferring huge amounts of cash to himself and the Family Trusts.

46.     The fiduciary duties Howard owed to Sklarco also required him to instruct Sklarco to pursue payment from each of the Family Trusts for all the unpaid Sklar Family JIB Expenses and Agency Services Fees that were owed to Sklarco and SEC as reflected in the Intercompany Account.  Rather than doing so, however, Howard continued to allow the unpaid Sklar Family JIB Expenses and Agency Services Fees to accrue in the Intercompany Account right up until the Petition Date.  Specifically, the last activity in the Intercompany Account before the Petition Date occurred on March 31, 2020, when the Family Trusts were billed approximately $300 in additional Sklar Family JIB Expenses.  As a result, as of the Petition Date, the Intercompany Account reflects that, net of any revenues on the Sklar Family Working Interests that were left in SEC, each of the Family Trusts owed the following unpaid amounts to Sklarco (collectively, the "Sklar Family Debt"):

| | |
|---|---|
| Howard Trust | $21,194,261 |
| SMMS/Miriam Sklar L.C. | $7,545,247 |
| Alan Trust | $118,774 |
| Sam Trust (predecessor to Jacob Trust) | $397,304 |
| Unallocated due to missing financial data[9] | $7,215,398 |
| **TOTAL DEBT** | **$36,470,984[10]** |

47.     In breach of the fiduciary duties he owed to Sklarco, Howard never pursued the Family Trusts to pay the Sklar Family Debt.  Moreover, Howard breached the fiduciary duties he

---

[9]     Despite repeated requests, the Trust's financial advisors have not received detailed general ledgers for either company for the period May 2010 to March 2016.  So while the financial records that are available indicate that $7,215,398 in unpaid Sklar Family JIB Expenses and Agency Services Fees were incurred during that time, the Trust is not able to allocate those unpaid expenses to the various Family Trusts.  The Trustee will request those general ledgers during discovery in this matter and will supplement this chart once he is able to complete the allocation.

[10]    As stated previously, Howard failed to disclose this substantial receivable due from the Family Trusts when he signed off on Sklarco's schedules of assets and liabilities that were filed in this chapter 11 case.

owed to SEC by failing to ensure that the Cash Call Funds and the Unpaid Working Interest Revenues were only used for their intended purposes. Instead, Howard put his own interests and the interests of his family above Sklarco's and SEC's interests, and allowed the Sklar Family Debt to balloon to extraordinary amounts, all the while allowing SEC to deposit the Cash Call Funds and the Unpaid Working Interest Revenues into SEC's general operating accounts in order to make extravagant cash distributions to himself and the Family Trusts.

48.     According to the SEC's schedules and the proofs of claim that were filed in that case, SEC owed over $18.6 million to trade vendors and working interest owners as of the Petition Date. That staggering amount of debt begs the question – how did a company whose entire business model assumed that for every operating expense that was incurred, there would be a corresponding payment from a working interest owner for their fair share of that expense, end up with that much unsecured debt on its books? As discussed above, the answer is clear – under Howard's management and ownership, SEC and Sklarco were forced to make cash payments and distributions to Howard and the Family Trusts in amounts that were unsustainable, all the while neglecting to pursue collection on the Sklar Family Debt.

49.     Had Howard honored his fiduciary duties to Sklarco and SEC, the approximately $36 million in Sklar Family Debt that existed in the Intercompany Account as reflected on Sklarco's books as of the Petition Date, and the resulting approximately $36 million in unpaid Sklarco receivables that existed on SEC's books as of the Petition Date would not exist; the Cash Call Funds would have been spent on their intended projects; the Unpaid Working Interest Revenues would have been paid to their rightful owners; SEC would have had more than sufficient cash on hand to fund all of its operational expenses; and this bankruptcy proceeding never would have happened. It was solely through Howard's malfeasance and greed that SEC and Sklarco were

forced into bankruptcy, with unsecured trade vendors and working interest owners left to pay the price.

### Causes of Action

**Cause of Action No. 1**
**Breach of Fiduciary Duty**
**(Against Howard F. Sklar, Individually)**

50.    The Trust repeats and realleges the allegations set forth in the above paragraphs.

51.    As the CEO and Manager of both Sklarco and SEC, Howard owed various obligations and fiduciary duties to both companies, including the duty of loyalty.

52.    As discussed above, Howard repeatedly breached his duty of loyalty to Sklarco and SEC, in violation of LSA-R.S. 12:1 -832(A)(1), by failing to pursue collection on the Sklar Family Debt, at a time when Howard knew or, through the exercise of reasonable diligence should have known, that failure to collect the amounts owed to Sklarco by the Family Trusts was working significant financial hardships on Sklarco and SEC.

53.    Howard's decision to not pursue collection on the Sklar Family Debt from the Family Trusts was not taken in good faith, in violation of LSA-R.S. 12:1-831(A)(2)(a).

54.    Howard's decision to not pursue collection on the Sklar Family Debt from the Family Trusts was either a decision that Howard did not reasonably believe to be in the best interests of Sklarco, or was a decision as to which Howard was not informed to an extent that was appropriate under the circumstances, in violation of LSA-R.S. 12:1-831(A)(2)(b).

55.    Howard's decision to not pursue collection on the Sklar Family Debt from the Family Trusts was the result of a lack of objectivity due to Howard's familial, financial, or business relationship with the Family Trusts, which could reasonably be expected to have affected his judgment in a manner adverse to Sklarco, in violation of LSA-R.S. 12:1-831(A)(2)(c).

56.     Howard's failure to pursue collection on the Sklar Family Debt from the Family Trusts was the result of a sustained failure by Howard to devote attention to ongoing oversight of the business and affairs of both Sklarco and SEC, or a failure to devote timely attention by making, or causing to be made, appropriate inquiry into the business and affairs of Sklarco and SEC, in violation of LSA-R.S. 12:1-831(A)(2)(d).

57.     Howard's decision to not pursue collection on the Sklar Family Debt from the Family Trusts conferred a financial benefit on Howard to which he was not entitled, in violation of LSA-R.S. 12:1-831(A)(2)(e).

58.     As a direct and proximate result of Howard's numerous breaches of the duties and obligations he owed to Sklarco and SEC by failing to pursue collection on the Sklar Family Debt from the Family Trusts, Sklarco and SEC suffered damages in an amount to be determined at trial, but at least equivalent to the amount of the Sklar Family Debt on the Petition Date.

**Cause of Action No. 2**
**Violations of LSA-R.S. 12:1-640, 1-830, and 1-833**
**(Against Howard F. Sklar, Individually)**

59.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

60.     In the four years prior to the Petition Date, Howard voted for, directed, and assented to the Howard Four-Year Distributions, the Alan Four-Year Distributions, the Jacob Four-Year Distributions, and the SMMS Four-Year Distributions (collectively, the "Four-Year Distributions"), each of which was more than what was permitted pursuant to LSA-R.S 12:1-640(C).  As of the date of each of the Four-Year Distributions, Sklarco was not able to pay its debts as they became due in the ordinary course of business.  Alternatively, as of the date of each of the Four-Year Distributions, Sklarco's total assets were less than the sum of its total liabilities.

61.     At the time Howard voted for, directed, or assented to each of the Four-Year Distributions, he was aware, or through the exercise of reasonable due diligence should have been aware, that Sklarco was unable to make those distributions without significantly impacting both Sklarco's and SEC's financial health.  Indeed, at the time Howard voted for, directed, or assented to the Four-Year Distributions, he was aware that SEC had converted the Cash Call Funds for its general business obligations, and had redirected the Unpaid Working Interest Revenue into general operating accounts, thereby subjecting SEC to significant liability.  Howard was also aware at the time of the Four-Year Distributions, or should have been aware through the exercise of reasonable due diligence, that SEC was slow-paying drilling contractors and other vendors that were critical to SEC's continued ability to operate.  As such, in voting for, directing, or assenting to each of the Four-Year Distributions, Howard acted in violation of LSA-R.S. 12:1-830 and 12:1-833.

62.     As a direct and proximate result of the numerous statutory violations as set forth above, Sklarco suffered damages in an amount to be determined at trial, but at least equivalent to the amount of the Four-Year Distributions.

### Cause of Action No. 3
### Breach of Contract
### (Against Miriam, SMMS, Howard Trust, Alan Trust, Jacob Trust)

63.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

64.     The ASA and the First Amendment to the ASA, copies of which are attached hereto as Exhibits A and B respectively, each represent a binding and enforceable contract between Sklarco and each of the Family Trusts.

65.     Pursuant to section 2.1, *et seq.* of the ASA, the Family Trusts authorized Sklarco to incur the Sklar Family JIB Expenses on behalf of the Family Trusts, and Sklarco agreed to pay those Sklar Family JIB Expenses to SEC on behalf of the Family Trusts.  *See* ASA, § 2.1.

66.     Also pursuant to section 2.1, *et seq.* of the ASA, the Family Trusts agreed to pay the Agency Services Fees to Sklarco, as compensation for Sklarco's ownership and management of the Sklar family oil and gas interests.

67.     Section 2.1 of the ASA provides that Sklarco would invoice each of the Family Trusts on or before the 20th of each month for each Family Trust's share of the Sklar Family JIB Expenses and the Agency Services Fees, and required each Family Trust to pay such charges to Sklarco within 15 days of receiving that invoice.  *See* ASA, § 2.1.  Sklarco timely invoiced each of the Family Trusts as required by Section 2.1 of the ASA.  Sklarco used an account called the Intercompany Account to record the monthly billings to the Family Trusts.

68.     Section 2.4 of the ASA required each of the Family Trusts to make monthly payments to Sklarco to reduce the "Intercompany Debt", as that term is defined in section 2.4 of the ASA.  The Intercompany Debt, as that term is defined by the ASA, was also recorded and tracked in the Intercompany Account.

69.     Section 2.6 of the ASA provides that interest in the amount of the then-applicable prime rate plus 1% shall apply to all amounts that are not timely paid by the Family Trusts as required by the ASA.

70.     In breach of sections 2.1, 2.2, 2.3, 2.4, and 2.6 of the ASA, the Family Trusts failed to pay all amounts that they were required to pay to Sklarco pursuant to the ASA as reflected on the Intercompany Account.  The last charge or activity on the Intercompany Account occurred on March 31, 2020.

71.     As a direct and proximate result of the Family Trusts' numerous and continuing breaches of the ASA, Sklarco was damaged in an amount at least equal to the Sklar Family Debt as reflected on the Intercompany Account at the Petition Date – approximately $36.4 million, plus

interest as permitted by section 2.6 of the ASA.  All conditions precedent to Sklarco's recovery on this claim have occurred or have been satisfied.

**Cause of Action No. 4**
**Actual Fraudulent Conveyances**
**Pursuant to 11 U.S.C. § 548(a)(1)(A) and § 550(a)**
**(Against All Defendants)**

72.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

73.     Each of the distributions set forth on attached Exhibits C, D, E, and F that occurred within 2 years of the Petition Date (collectively, the "Two-Year Distributions") were of an interest of the Debtors in property.

74.     The Two-Year Distributions were made within two years of the Petition Date.

75.     Pleading further, or in the alternative, if the Court determines as a matter of law that Howard did not breach the fiduciary duties and statutory obligations he owed to Sklarco and SEC, the Trust asserts that the Two-Year Distributions were made with the intent to hinder, delay, or defraud entities to which the Debtors were or became indebted to on or after the date these transfers were made.

76.     Pleading further, or in the alternative, pursuant to 11 U.S.C. § 548(a)(1)(A), the Trust thus asks this Court to avoid the Two-Year Distributions.

77.     Howard and the Howard Trust were the initial transferees of each of the distributions reflected on Exhibit C hereto that occurred within two years of the Petition Date (collectively, the "Howard Two-Year Distributions").  In the alternative, each of Howard and the Howard Trust were the persons or entity for whose benefit each of the Howard Two-Year Distributions were made. Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Howard Two-Year Distributions from Howard and the Howard Trust.

78.     The Alan Trust was the initial transferee of each of the distributions reflected on Exhibit D hereto that occurred within two years of the Petition Date (collectively, the "Alan Two-Year Distributions").  In the alternative, the Alan Trust was entity for whose benefit each of the Alan Two-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Alan Two-Year Distributions from the Alan Trust.

79.     The Jacob Trust was the initial transferee of each of the distributions reflected on Exhibit E hereto that occurred within two years of the Petition Date (collectively, the "Jacob Two-Year Distributions").  In the alternative, the Jacob Trust was the entity for whose benefit each of the Jacob Two-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Jacob Two-Year Distributions from the Jacob Trust.

80.     SMMS was the initial transferee of each of the distributions reflected on Exhibit F hereto that occurred within two years of the Petition Date (collectively, the "SMMS Two-Year Distributions").  In the alternative, SMMS was the entity for whose benefit each of the SMMS Two-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the SMMS Two-Year Distributions from SMMS.

**Cause of Action No. 5**
**Constructively Fraudulent Conveyances**
**Pursuant to 11 U.S.C. § 548(a)(1)(B) and § 550(a)**
**(Against All Defendants)**

81.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

82.     The Two-Year Distributions were of an interest of the Debtors in property.

83.     The Two-Year Distributions were made within two years of the Petition Date.

84.     Sklarco and SEC received less than reasonably equivalent value in exchange for each of the Two-Year Distributions because they were made to satisfy obligations that were not owed by Sklarco and SEC.

22

85.     Sklarco and SEC were insolvent on the date each of the Two-Year Distributions was made or became insolvent because of those distributions.

86.     As a result of the Two-Year Distributions, Sklarco and SEC were engaged in business or a transaction or was about to engage in business or a transaction for which any property remaining within Sklarco and SEC was unreasonably small capital.

87.     As a result of the Two-Year Distributions, Sklarco and SEC intended to incur or believed that they would incur debts that would be beyond their ability to pay as such debts matured.

88.     Pleading further, or in the alternative, if the Court determines as a matter of law that Howard did not breach the fiduciary duties and statutory obligations he owed to Sklarco and SEC, pursuant to 11 U.S.C. § 548(a)(1)(B), the Trust thus asks this Court to avoid each of the Two-Year Distributions.

89.     Howard and the Howard Trust were the initial transferees of each of the Howard Two-Year Distributions.  In the alternative, each of Howard and the Howard Trust were the persons or entity for whose benefit each of the Howard Two-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Howard Two-Year Distributions from Howard and the Howard Trust.

90.     The Alan Trust was the initial transferee of each of the Alan Two-Year Distributions. In the alternative, the Alan Trust was entity for whose benefit each of the Alan Two-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Alan Two-Year Distributions from the Alan Trust.

91.     The Jacob Trust was the initial transferee of each of the Jacob Two-Year Distributions. In the alternative, the Jacob Trust was the entity for whose benefit each of the Jacob Two-Year

Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Jacob Two-Year Distributions from the Jacob Trust.

92.     SMMS was the initial transferee of each of the SMMS Two-Year Distributions.  In the alternative, Miriam was the entity for whose benefit each of the SMMS Two-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the SMMS Two-Year Distributions from SMMS.

**Cause of Action No. 6**
**Actual Fraudulent Conveyances**
**Pursuant to C.R.S.A. § 38-8-105(1)(a), § 38-8-108, and § 38-8-109**
**(Against All Defendants)**

93.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

94.     Each of the Four-Year Distributions were of an interest of the Debtors in property.

95.     The Four-Year Distributions were made within four years of the Petition Date.

96.     The Four-Year Distributions were made with the intent to hinder, delay, or defraud entities to which the Debtors were or became indebted to on or after the date these transfers were made.

97.     Pleading further, or in the alternative, if the Court determines as a matter of law that Howard did not breach the fiduciary duties and statutory obligations he owed Sklarco and SEC, pursuant to C.R.S.A. § 38-8-105(1)(a) the Trust thus asks this Court to avoid the Four-Year Distributions.

98.     Howard and the Howard Trust were the initial transferees of each of the Howard Four-Year Distributions.  In the alternative, each of Howard and the Howard Trust were the persons or entity for whose benefit each of the Howard Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-108(1)(c) and § 38-8-109(2)(a), the Trust may recover 150% (1.5

times) the value of the Howard Four-Year Distributions from Howard and the Howard Trust, plus actual costs incurred in pursuit of judgment.

99.     The Alan Trust was the initial transferee of each of Alan Four-Year Distributions.  In the alternative, the Alan Trust was entity for whose benefit each of the Alan Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-108(1)(c) and § 38-8-109(2)(a), the Trust may recover 150% (1.5 times) the value of the Alan Four-Year Distributions from the Alan Trust, plus actual costs incurred in pursuit of judgment.

100.     The Jacob Trust was the initial transferee of each of the Jacob Two-Year Distributions. In the alternative, the Jacob Trust was the entity for whose benefit each of the Jacob Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-108(1)(c) and § 38-8-109(2)(a), the Trust may recover 150% (1.5 times) the value of the Jacob Four-Year Distributions from the Jacob Trust, plus actual costs incurred in pursuit of judgment.

101.     SMMS was the initial transferee of each of SMMS Four-Year Distributions.  In the alternative, SMMS was the entity for whose benefit each of the SMMS Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-108(1)(c) and § 38-8-109(2)(a), the Trust may recover 150% (1.5 times) the value of the SMMS Four-Year Distributions from SMMS, plus actual costs incurred in pursuit of judgment.

**Cause of Action No. 7**
**Constructively Fraudulent Conveyances**
**Pursuant to C.R.S.A. § 38-8-105(1)(b), § 38-8-108, and § 38-8-109**
**(Against All Defendants)**

102.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

103.     The Four-Year Distributions were of an interest of the Debtors in property.

104.     The Four-Year Distributions were made within four years of the Petition Date.

105.    Sklarco and SEC received less than reasonably equivalent value in exchange for each of the Four-Year Distributions because they were made to satisfy obligations that were not owed by Sklarco and SEC.

106.    Sklarco and SEC were insolvent on the date each of the Four-Year Distributions was made or became insolvent because of those distributions.

107.    As a result of the Four-Year Distributions, Sklarco and SEC were engaged in business or a transaction, or were about to engage in business or a transaction, for which any property remaining within Sklarco and SEC was unreasonably small capital.

108.    As a result of the Four-Year Distributions, Sklarco and SEC intended to incur or believed that they would incur debts that would be beyond their ability to pay as such debts matured.

109.    Pleading further, or in the alternative, if the Court determines as a matter of law that Howard did not breach the fiduciary duties and statutory obligations he owed to Sklarco and SEC, pursuant to C.R.S.A. § 38-8-105(1)(b), the Trust thus asks this Court to avoid each of the Four-Year Distributions.

110.    Howard and the Howard Trust were the initial transferees of each of the Howard Four-Year Distributions.  In the alternative, each of Howard and the Howard Trust were the persons or entity for whose benefit each of the Howard Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-109(2)(a), the Trust may recover the value of the Howard Four-Year Distributions from Howard and the Howard Trust.

111.    The Alan Trust was the initial transferee of each of Alan Four-Year Distributions.  In the alternative, the Alan Trust was entity for whose benefit each of the Alan Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-109(2)(a), the Trust may recover the value of the Alan Four-Year Distributions from the Alan Trust.

26

112.     The Jacob Trust was the initial transferee of each of the Jacob Four-Year Distributions.  In the alternative, the Jacob Trust was the entity for whose benefit each of the Jacob Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-109(2)(a), the Trust may recover the value of the Jacob Four-Year Distributions from the Jacob Trust.

113.     SMMS was the initial transferee of each of SMMS Four-Year Distributions.  In the alternative, SMMS was the entity for whose benefit each of the SMMS Four-Year Distributions were made.  Accordingly, pursuant to C.R.S.A. § 38-8-109(2)(a), the Trust may recover the value of the SMMS Four-Year Distributions from SMMS.

**Cause of Action No. 8**
**Avoidable Preferences**
**Pursuant to 11 U.S.C. § 547(b) and 550(a)**
**(Against All Defendants)**

114.     The Trust repeats and realleges the allegations set forth in the above paragraphs.

115.     Each of the distributions reflected on Exhibits C, D, E, and F that occurred within one year of the Petition Date are collectively referred to as the "One-Year Distributions".

116.     Pleading further, or in the alternative, if the Court determines as a matter of law that Sklarco was liable for payment of the One-Year Distributions, the Trust seeks to recover those distributions under 11 U.S.C. § 547(b).

117.     The One-Year Distributions were made to or for the benefit of Defendants, each of whom were creditors of Sklarco.

118.     The One-Year Distributions were made for or on account of antecedent debts owed by the Sklarco to Defendants.

119.     Sklarco was insolvent at the time the One-Year Distributions were made.

120.     The One-Year Distributions were each made to an insider of Sklarco, on or within one year before the Petition Date.

27

121.     The One-Year Distributions enabled each of the Defendants to receive more than they would have been received if (a) the case was a case under Chapter 7 of the Bankruptcy Code; (b) such distributions had not been made; and (c) each Defendant had received payment on such debt to the extent provided by the provisions of the Bankruptcy Code.

122.     Howard and the Howard Trust were the initial transferees of each of distributions reflected on Exhibit C that occurred within one year of the Petition Date (collectively, the "Howard One-Year Distributions").  In the alternative, each of Howard and the Howard Trust were the persons or entity for whose benefit each of the Howard One-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Howard One-Year Distributions from Howard and the Howard Trust.

123.     The Alan Trust was the initial transferee of each of the distributions reflected on Exhibit D that occurred within one year of the Petition Date (collectively, the "Alan One-Year Distributions").  In the alternative, the Alan Trust was entity for whose benefit each of the Alan One-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Alan One-Year Distributions from the Alan Trust.

124.     The Jacob Trust was the initial transferee of each of the distributions reflected on Exhibit E that occurred within one year of the Petition Date (collectively, the "Jacob One-Year Distributions").  In the alternative, the Jacob Trust was the entity for whose benefit each of the Jacob One-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the value of the Jacob One-Year Distributions from the Jacob Trust.

125.     SMMS was the initial transferee of each of the distributions reflected on Exhibit F that occurred within one year of the Petition Date (collectively, the "SMMS One-Year Distributions").  In the alternative, SMMS was the entity for whose benefit each of the SMMS

28

One-Year Distributions were made.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust

may recover the value of the SMMS One-Year Distributions from SMMS.

### Cause of Action No. 9
### Avoidance of Property Right Claims
### Pursuant to 11 U.S.C. § 544(a)
### (Against All Defendants)

126.    The Trust repeats and realleges the allegations set forth in the above paragraphs.

127.    On the Petition Date, each of the Sklar Family Working Interests were titled and

recorded solely in the name of Sklarco, and not in the name of any of the Defendants.

128.    Defendants each assert, individually and collectively, an equitable ownership

interest in the Sklar Family Working Interests.

129.    None of the equitable ownership interests that Defendants assert in the Sklar Family

Working Interests was publicly recorded and/or perfected under applicable state law so as to be

enforceable against a judicial lien creditor of Sklarco on the Petition Date.

130.    None of the equitable ownership interests that Defendants assert in the Sklar Family

Working Interests was publicly recorded and/or perfected under applicable state law so as to be

enforceable against a creditor who executes or levies on Sklarco's property on the Petition Date.

131.    None of the equitable ownership interests that Defendants assert in the Sklar Family

Working Interests was publicly recorded and/or perfected under applicable state law so as to be

enforceable against a bona fide purchaser of real property from Sklarco on the Petition Date.

132.    Pursuant to 11 U.S.C. §§ 544(a)(1), 544(a)(2), and 544(a)(3), the Trust asks the

Court to avoid Defendants' asserted equitable ownership interests in the Sklar Family Working

Interests.

133.    Howard and the Howard Trust each assert an equitable ownership interest in the Sklar

Family Working Interests.  In the alternative, Howard and the Howard Trust are each entities for

whose benefit the equitable ownership interests in the Sklar Family Working Interests are asserted. Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the Sklar Family Working Interests, and/or the value of the Sklar Family Working Interests, from Howard and the Howard Trust.

134.     The Alan Trust asserts an equitable ownership interest in the Sklar Family Working Interests.  In the alternative, the Alan Trust is an entity for whose benefit the equitable ownership interests in the Sklar Family Working Interests are asserted.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the Sklar Family Working Interests, and/or the value of the Sklar Family Working Interests, from the Alan Trust.

135.     The Jacob Trust asserts an equitable ownership interest in the Sklar Family Working Interests.  In the alternative, the Jacob Trust is an entity for whose benefit the equitable ownership interests in the Sklar Family Working Interests are asserted.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the Sklar Family Working Interests, and/or the value of the Sklar Family Working Interests, from the Jacob Trust.

136.     SMMS asserts an equitable ownership interest in the Sklar Family Working Interests. In the alternative, SMMS is an entity for whose benefit the equitable ownership interests in the Sklar Family Working Interests are asserted.  Accordingly, pursuant to 11 U.S.C. § 550(a)(1), the Trust may recover the Sklar Family Working Interests, and/or the value of the Sklar Family Working Interests, from SMMS.

**Cause of Action No. 10**
**Equitable Subordination Pursuant to 11 U.S.C. § 510(c)**
**(Against Howard Trust, Alan Trust, and Jacob Trust)**

137.     The Trustee repeats and realleges the allegations set forth in the above paragraphs.

138.    After the Petition Date, Howard filed proofs of claim on behalf of the Howard Trust, the Alan Trust, and the Jacob Trust, seeking to extract yet more cash from Sklarco and SEC. Specifically, Howard caused the Howard Trust, the Alan Trust, and the Jacob Trust to file the following proofs of claim in these jointly administered chapter 11 cases (collectively, the "Sklar Proofs of Claim"):

| Claimant | Debtor | Amount | Claim Number |
|----------|--------|--------|--------------|
| Alan Trust | Sklarco | $157,700.00 | 10146 |
| Jacob Trust | Sklarco | $94,800.00 | 10147 |
| Howard Trust | Sklarco | Undetermined | 10148 |
| Alan Trust | Sklarco | Undetermined | 10149 |
| Jacob Trust | Sklarco | Undetermined | 10150 |

139.    As discussed above, Howard repeatedly used his positions as CEO and Manager of Sklarco and SEC to benefit his and his family's personal financial interests, to the detriment of Sklarco and the creditors of Sklarco.  Howard's actions in that regard were inequitable in that they represent multiple breaches of the fiduciary duties he owed both Sklarco and SEC, and they directly injured both Sklarco's and SEC's creditors.

140.    As a result of the foregoing, the Trust asks the Court to equitably subordinate each of the Sklar Proofs of Claim, such that none of the Sklar Proofs of Claim shall be entitled to any payment unless and until all other general unsecured claims of Sklarco and SEC are paid in full. Under these circumstances, equitable subordination of the Sklar Proofs of Claim is consistent with 11 U.S.C. § 510(c) and generally accepted principles of equitable subordination as applied to corporate insiders such as Howard.

**Objections to the Sklar Proofs of Claim**

141.    The Trust repeats and realleges the allegations set forth in the above paragraphs.

142.    For the reasons discussed above, the Trust objects to each of the Sklar Proofs of Claim.  Specifically, each of the Sklar Proofs of Claim should be disallowed in their entirety

pursuant to general bankruptcy principles of equity, prior orders of the Court, and the doctrine of

unclean hands.  It would be the height of injustice to allow the Howard Trust, the Alan Trust, and

the Jacob Trust to extract more money from Sklarco under these circumstances.

## **Conditions Precedent**

143.     All conditions precedent to the Trust's claims for relief as set forth herein have been

performed or have occurred.

## **Conclusion**

Wherefore, based upon the above allegations, the Trustee respectfully requests that the

Court enter judgment in favor of the Trust and against each of the Defendants as follows:

a.     As to Cause of Action No. 1, awarding damages against Howard F. Sklar, Individually, in amount of not less than the Sklar Family Debt on the Petition Date, plus all other actual and consequential damages flowing therefrom;

b.     As to Cause of Action No. 2, awarding damages against Howard F. Sklar, Individually, in an amount not less than the Four-Year Distributions, plus all other actual and consequential damages flowing therefrom;

c.     As to Cause of Action No. 3, awarding damages against each of the Family Trusts, jointly and severally, in an amount no less than the Sklar Family Debt plus interest calculated pursuant to Section 2.6 of the ASA, plus all other actual and consequential damages flowing therefrom;

d.     In the alternative, as to Cause of Action Nos. 4 and 5, avoiding each of the Two-Year Distributions and directing Defendants to repay the value of the Two-Year Distributions;

e.     In the alternative, as to Cause of Action No. 6, avoiding each of the Four-Year Distributions and directing Defendants to repay 150% (1.5 times) the value of the Four-Year Distributions they each received plus the Trust's actual costs in pursuit of judgment;

f.     In the alternative, as to Cause of Action No. 7, avoiding each of the Four-Year Distributions and directing Defendants to repay the value of the Four-Year Distributions ;

g.     In the alternative, as to Cause of Action No. 8, avoiding each of the One-Year Distributions and directing Defendants to repay the value of the One-Year Distributions;

h.     As to Cause of Action No. 9, avoiding Defendants' assertions of equitable ownership in any of the Sklar Family Working Interests, and directing Defendants to return the Sklar Family Working Interests, and/or the value of the Sklar Family Working Interests, to the Trust;

f.     As to Cause of Action No. 10, equitably subordinating each of the Sklar Proofs of Claim to repayment in full of all other general unsecured claims of Sklarco and SEC or, in the alternative, sustaining the Trust's objections to each of the Sklar Proofs of Claim such that they are each disallowed in their entirely;

g.     Directing Defendants, jointly and severally, to pay pre- and post-judgment interest on all amounts awarded as damages as allowed by law;

h.     Directing Defendants, jointly and severally, to pay all costs of court and attorneys' fees that the Trust has incurred in pursuit of these actions to the fullest extent permitted by applicable law; and

i.     Awarding the Trust such other and further relief that this Court deems just and proper.

Dated this 31st day of March 2022.

DIAMOND MCCARTHY LLP


By:  */s/ Stephen T. Loden*
      Stephen T. Loden, Reg. No. 45592
      Christopher D. Johnson, *pro hac vice*
      909 Fannin Street, Suite 3700
      Houston, Texas 77010
      Tel. (713) 333-5100
      Fax:  (713) 333-5155

      *Attorneys for Thomas M. Kim,*
      *Trustee of the Sklarco Creditor Trust*

**EXHIBIT A**

## AGENCY SERVICES AGREEMENT

**STATE OF LOUISIANA,**

**PARISH OF CADDO.**

    **BE IT KNOWN** That this day before me, the undersigned authority, a Notary Public in and for the said Parish, State aforesaid, duly commissioned and sworn, personally came and appeared:

        **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by David A. Barlow, its Vice President – Chief Operating Officer (**"SEC"** or **"Operator"**), and

        **SKLARCO L.L.C.**, a Louisiana limited liability company, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, represented herein by David A. Barlow, its Vice President – Chief Operating Officer (**"Sklarco"**), and

        **HOWARD F. SKLAR**, husband of Jane Sklar, a resident of Caddo Parish, Louisiana, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101, appearing herein in the following capacities (in such capacities hereinafter sometimes referred to as **"Howard"**) with respect to the following described entities, trust relationships and other persons (hereinafter sometimes referred to individually as a **"Principal"** and collectively as the **"Principals"**):

        as the Manager of the **MIRIAM SKLAR L.C.** a Louisiana limited liability company, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101;

        as the Trustee of **HOWARD TRUST** (TIN: 72-6094620) (the **"Howard Trust"**), an irrevocable inter vivos trust created under the laws of the State of Louisiana, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101;

        as the Trustee of **ALAN TRUST** (TIN: 72-6157679), (the **"Alan Trust"**) an irrevocable inter vivos trust created under the laws of the State of Louisiana, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101;

1810522-1

as the Trustee of **SAM TRUST** (TIN: 72-6131834), (the "**Sam Trust**") an irrevocable inter vivos trust created under the laws of the State of Louisiana, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101; and

as the duly appointed Independent Executor of the **SUCCESSION OF MIRIAM MANDEL SKLAR** (TIN: 27-6579529), (the "**Estate of Miriam**"), pursuant to that certain order dated April 21, 2010, of the First Judicial District Court, Caddo Parish, Louisiana, Suit No. 540336-B;

who declared that Operator, Principals and Sklarco have made and entered into this Agency Services Agreement (this "**Agreement**") on the following terms and conditions:

## WITNESSETH

**WHEREAS**, until the death of Miriam Mandel Sklar ("**Miriam**") on April 16, 2010 (the "**Date of Death**"), Sklarco served, pursuant to that certain "Prior Agency Services Agreement" (as defined in Section 1.5 below), as the nominee of Miriam and the other parties to the Prior Agency Services Agreement, and has held title to and maintained various rights, titles and interests in property, movable and immovable, personal and real, corporeal and incorporeal, tangible or intangible, and otherwise, co-owned by Miriam with the other parties to the Prior Agency Services Agreement (herein collectively referred to as the "**Property**");

**WHEREAS,** the Estate of Miriam is the successor to the membership interests of Miriam in Miriam Sklar L.C., as provided in the Amended and Restated Operating Agreement for Miriam Sklar L.C.; and

**WHEREAS**, as of the Date of Death, **SEC** was owned by Howard Trust and Miriam and operates oil and gas wells located on lands covered by oil, gas and other mineral leases, or lands pooled therewith, including leases that comprise a portion of the Property, and provides certain "seconded employee" services to Sklarco, as identified in Section 3.2 below; and

**WHEREAS**, effective as of the Date of Death the Membership Interest in SEC owned by Miriam was redeemed by SEC pursuant to that certain "Act of Redemption" by and among SEC and the Estate of Miriam; and

**WHEREAS**, each of the Principals desires to continue to retain Sklarco to develop, maintain and manage such Property on behalf of each Principal, including, but not limited to, the development, maintenance and management of all oil and gas properties and the acquisition and maintenance of records, accounting, personnel, equipment and legal affairs, with full authority to transact all matters relating thereto on the terms and conditions set forth in this Agreement; and

**WHEREAS**, Sklarco and each of the Principals have agreed to enter into this Agreement (1) to memorialize their agreement as to the basis by which Sklarco has provided agency

1810522-1

services, and will continue to provide such services on behalf of the Principals and the Estate of Miriam from and after the Date of Death, (2) to formalize the relationship between the parties and (3) to ratify prior acts performed by Sklarco on behalf of Miriam and each Principal, all on the terms and conditions herein set forth;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements herein, the parties hereto agree as follows:

## AGREEMENT

### 1.    Powers and Authority of Sklarco.

1.1    To facilitate Sklarco's management of the Property each of the Principals does hereby make Sklarco its true and lawful agent and attorney in fact, for each Principal, in his name, place and stead, to do any and every act and to exercise any and every power that each of the Principals might or could do or exercise through any other person with respect to the Property, including not only all matters of administration but also all acts of ownership and the doing of whatever may appear to Sklarco to be conducive to the interests of each of the Principals. Sklarco hereby agrees to serve as the agent and attorney in fact for each of the Principals in accordance with the terms and conditions of this Agreement. Each of the Principals specifically acknowledges and agrees that the rights, titles and interests in the Property shall be recorded and held in the name of Sklarco, as nominee for each Principal.

1.2    Without in any manner limiting or restricting any of the foregoing, each of the Principals hereby grants unto said agent and attorney in fact, for each of the Principals and in each of the Principals' name, place and stead, full power and authority:

(1)    To accept as a gift or donation or to purchase or otherwise acquire, in any manner, all kinds of things or property, whether movable or immovable, personal or real, corporeal or incorporeal, tangible or intangible, wheresoever situated, in whole or in part, or an undivided interest therein (such property so acquired shall also be included in the term "**Property**" as used herein);

(2)    To do the following things and perform the following acts with respect to any or all of the Principals' interest, or any part thereof, or an undivided interest therein, in the Property:

(a)    To pledge, pawn, mortgage, grant security interests in, hypothecate, file or authorize the filing of UCC-1 financing statements, collaterally assign and pledge or otherwise encumber the interests of any or all of the Principals in the Property in any manner to secure the borrowings, debts, loans and other obligations incurred by Sklarco for or on

behalf of any or all of the Principals as authorized by this Agreement;

(b)    To subject the Property to options, easements or servitudes, mineral or otherwise;

(c)    To grant royalty interests affecting the Property;

(d)    To grant leases or subleases covering or affecting the Property, including, but without being limited to, oil, gas and mineral leases and subleases, with or without provisions for the pooling of the leased premises, in whole or in part, with other lands and mineral interests;

(e)    To use, administer, build upon or otherwise improve, repair, demolish, partition, divide or subdivide the Property in any manner;

(f)    To exchange, sell, convey, assign or otherwise dispose of the Property, in whole or in part, in any manner which Sklarco deems advisable;

(g)    To make and sign all kinds of agreements pertaining to the Property, including, but without being limited to, the making and signing of assignments, farmout agreements, operating agreements, gas purchase agreements, pooling agreements, unitization agreements, division orders and transfer orders, and agreements supplementing, amending or rescinding such agreements, whether made by any Principal personally or through an agent, pertaining to the doing of anything which Sklarco is authorized to do hereunder;

(3)    To borrow money or otherwise contract loans, to acknowledge debts, to make or endorse promissory notes, issue guaranties, and to make or accept all kinds of bills of exchange for any purpose as Sklarco may elect in its sole discretion, such purposes may include, but are not limited to, to fund the costs of any or all of the Principals in acquiring, operating, exploring, refinancing, developing, or re-developing any of the Property, or to provide funds sufficient for Sklarco to provide operating funds for the benefit of any or all of the Principals as Sklarco, in its sole discretion, may deem necessary, useful or convenient for any such Principal;

(4)    To endorse, collect and receive the proceeds of any promissory note, draft, check or other bill of exchange made payable to Sklarco in its capacity as

nominee for any Principal, or to any Principal or to any Principal's order and give receipt therefor, and to endorse for deposit in or for collection by any bank or corporate institution, wheresoever situated, drafts, checks or other bills of exchange made payable to Principal or to Principal's order;

(5)   To commingle any Principal's funds with other funds held by Sklarco as agent or otherwise, subject to Sklarco's obligations as to accounting and reporting set forth in this Agreement;

(6)   To adjust, settle, compromise or submit to arbitration all matters concerning the Property;

(7)   To demand, make allowances in respect to, remit or recover and receive anything due or belonging to any Principal and relating to the Property;

(8)   To commence, prosecute, discontinue, arbitrate, compromise, settle, confess judgment or defend all kinds of claims, actions and proceedings of any Principal concerning the Property in any manner, with full power to waive citation, to accept service, to plead prescription and to apply for writs and all other process, including appeal;

(9)   To prepare, execute and file any application, tax return, report, notice, statement, consent, protest, waiver, petition or agreement or document required or permitted to be filed with respect to the Property under any law, ordinance, resolution, rule, regulation or directive of the United States of America, of any State of the United States of America, or of any department of, or corporation, board, authority, agency, political subdivision or instrumentality heretofore or hereafter created, designated or established by the United States of America or any State thereof; to represent each Principal before the proper office, officer or court with respect to all such documents and the matters to which they pertain; and, without limiting or in any manner restricting the foregoing, to receive, endorse and collect checks in payment of refund of taxes, licenses, penalties or interest; and to receive and inspect confidential information with respect to each Principal's liability under any law, ordinance, resolution, rule, regulation or directive above described;

(10)  To contract concerning the Property on behalf of any Principal with itself and with third parties for whom Sklarco also serves as agent and nominee;

(11)  To employ any person or persons, firm or corporate institution to perform any act or acts or to do anything which Sklarco deems to be in each Principal's interest and to pay therefor from such Principal's funds and to terminate such employment;

(12) To appoint any other person or persons as the substitute of Sklarco to do any act or exercise any power which Sklarco could do or exercise hereunder;

(13) To exercise any and all of the powers herein granted to Sklarco, as and when, to the extent, in the manner, for such price or other consideration or reason and subject to such terms and conditions, usual or unusual, as are acceptable to Sklarco;

(14) To execute and deliver all kinds of instruments to evidence the exercise by Sklarco of the powers herein granted to Sklarco; and

(15) To do and perform all and every act and thing whatsoever requisite and necessary to be done in the premises, as fully and to all intents and purposes as each Principal might or could do if personally present.

1.3    Each of the Principals hereby ratifies and confirms, and promises at all times to ratify and confirm, all and whatsoever Sklarco has done, or shall lawfully do or cause to be done under this Agreement, including anything which shall be done between the expiration or revocation of this Agreement and notice of such expiration or revocation reaching Sklarco, and each of the Principals does hereby declare that, as against each Principal and all persons claiming under such Principal, everything which Sklarco shall do or cause to be done in pursuance hereof after such expiration or revocation shall be valid, binding, enforceable and effectual in favor of any person claiming the benefit thereof who before the doing thereof shall not have had actual or constructive notice of such expiration or revocation.

1.4    Notwithstanding anything herein to the contrary, in the event that Sklarco on behalf of any of the Principals, in its exercise of the powers and authority herein granted to Sklarco by such Principal, enters into a contract with another party and this Agreement expires or is revoked by such Principal during the term of such contract, then each such Principal does hereby declare that as against such Principal and all persons claiming under such Principal, such contract shall remain in full force and effect for the remainder of the term of such contract. In all of the instances addressed by this Section 1.4 of this Agreement, everything which Sklarco shall do or cause to be done in compliance with the obligations of such contracts prior to the termination thereof, shall be valid, binding, enforceable and effectual in favor of any person claiming the benefit thereof.

1.5    Each of the Principals acknowledges that Sklarco has maintained and managed the Property on behalf of Miriam and each Principal prior to the effective date of this Agreement pursuant to, inter alia, that certain Agency Service Agreement dated December 14, 2007, by and among Sklarco L.L.C., as Agent, and Howard F. Sklar, in various capacities, as Principal (the "**Prior Agency Services Agreement**"). Certain of the parties to the Prior Agency Services Agreement, namely Suzy Trust, Justin S. Simons Grantor Trust and Jonathan S. Simons Grantor Trust, terminated the Prior Agency Services Agreement as between themselves and Sklarco pursuant to that certain letter agreement dated December 31, 2008, by and between Miriam,

1810522-1

Suzanne S. Simons, Justin S. Simons and Howard F. Sklar in which the signatories agreed to a Plan of Separation and Reorganization for the Sklar Family Business Enterprise (the "**Plan of Reorganization**") and/or subsequent instruments. Certain other parties to the Prior Agency Services Agreement, namely Suzhow L.L.C., SOC2 L.L.C., Sklar Acquisition Company L.L.C., Sklar Children's L.L.C. and Sklar, Inc., have distributed their oil and gas assets to their members/shareholders in accordance with the Plan of Reorganization, and, having no oil and gas assets to administer, have also terminated their agency relationship under the Prior Agency Services Agreement with Sklarco. The remaining parties to the Prior Agency Services Agreement and the Estate of Miriam as successor to Miriam are the Principals hereunder. Each of the Principals hereby ratifies and confirms all actions which Sklarco has taken with respect to its Property prior to the Effective Date which are consistent with the power and authority granted by each Principal to Sklarco under the terms of this Agreement, as fully as if this Agreement had been executed and in effect at the time of such prior acts of maintenance and management.

2.  **Payments and Accounting**.

    2.1    Except as herein otherwise specifically provided, Sklarco shall promptly pay and discharge expenses incurred for or on behalf of each Principal in relation to the Property. Each month Sklarco shall invoice each Principal on or before the 20th day of each month for his respective proportionate share of such expenses incurred during the preceding month, together with the Agency Services Fees as identified in Sections 2.2.1 through 2.4 below. A statement which identifies the Property involved, and all charges and credits summarized by appropriate classifications of income and expense, shall accompany such invoice. Each Principal shall pay such charges within fifteen (15) days after receipt of the invoice, or, in the alternative, Sklarco may deduct such charges from any funds held by Sklarco for each Principal's account. Sklarco shall keep an accurate record of such expenditures together with any credits to which each Principal is entitled.

    2.2.1    Contemporaneously with the Plan of Reorganization, the Principals and Sklarco, acting pursuant to Section 2.2.1 of the Prior Agency Services Agreement, adjusted the monthly "Agency Services Fee" set forth in the Section 2.2 of the Prior Agency Services Agreement, commencing January 1, 2009, as follows:

    2.2.1.1    From and after January 1, 2009 Howard Trust paid to Sklarco, and, in consideration of the services to be rendered by Sklarco pursuant to this Agreement, Howard Trust agrees to continue to pay to Sklarco for the duration of this Agreement, a monthly amount equal to the sum of three (3) monthly charges, namely, the (a) G&A Agency Services Fee (as defined in this Section 2.2.3 below) allocated to Howard Trust in the manner provided in Section 2.2.3, (b) the Aircraft Agency Services Fee (as defined in Section 2.3 below) allocated to Howard Trust in the manner provided in Section 2.3 below, and (c) the Interest Agency Services Fee (as defined in Section 2.4 below) allocated to Howard Trust in the manner provided in Section 2.4 below.

2.2.1.2   From and after January 1, 2009, and through April 1, 2010, in consideration of the services rendered by Sklarco, Miriam and Miriam Sklar L.C. in solido paid to Sklarco a monthly amount equal to the sum of (a) the G&A Agency Services Fee allocated to Miriam and Miriam Sklar L.C. in the manner provided in Section 2.2.3, (b) the portion of the Aircraft Agency Services Fee allocated to the Miriam in the manner provided in Section 2.3 below, and (c) the Interest Agency Services Fee allocated to Miriam and Miriam Sklar L.C in the manner provided in Section 2.4 below.

2.2.1.3   From and after January 1, 2009, Alan Trust and Sam Trust each paid to Sklarco, and, in consideration of the services to be rendered by Sklarco pursuant to this Agreement, each agrees to continue to pay to Sklarco for the duration of this Agreement, a monthly amount equal to the sum of two (2) monthly charges, namely, the G&A Agency Services Fee and the Interest Agency Services Fee, allocated to each of Alan Trust and Sam Trust in the manner described in Sections 2.2.3 and 2.4 respectively.

2.2.2   From and after May 1, 2010, in consideration of the services to be rendered by Sklarco pursuant to this Agreement, the Estate of Miriam and Miriam Sklar L.C. agree in solido to pay to Sklarco a monthly amount equal to the sum of (i) $30,000.00 (the "**Agency Services Fee**") in lieu of the G&A Agency Services Fee and the Aircraft Agency Services Fee, and (ii) the Interest Agency Services Fee allocated to the Estate of Miriam and Miriam Sklar L.C in the manner provided in Section 2.4 below, until the "Intercompany Debt" (as defined in Section 2.4 below) owed by the Estate of Miriam and Miriam Sklar, L.C. is paid in full to Sklarco.

2.2.3   The "**G&A Agency Services Fee**" means the sum of (a) general and administrative costs incurred by SEC during a calendar month minus (b) operating income and any other revenues for such month (but excluding revenue or expenses associated with the Aircraft Agency Services Fee and the Interest Agency Services Fee).  Each of the Principals shall bear a fraction of the G&A Agency Services Fee equal to a fraction whose numerator consists of that Principal's "**NOR**" (as defined in this Section 2.2.3 below) and whose denominator consists of all of the Principals' NOR.  For purposes hereof, "**NOR**" means the monthly net operating revenue of a Principal, or of the Principals, received from the sale of oil and gas produced from wells in which each owns an interest, for each month severance and excise taxes, other revenue deductions and lease operating expenses.  NOR does not include any capital expenses.  Sklarco agrees with SEC that SEC shall invoice Sklarco for, and Sklarco shall owe, an amount each month equal to the total sum paid by the Principals as "G&A Agency Services Fee" and Agency Services Fee.

2.2.4   The Agency Services Fee as identified in Section 2.2.2 will be adjusted annually, as of January 1 each year, commencing January 1, 2011, based upon the percentage change in the average of the Consumer Price Index for Urban Wage Earners and Clerical Workers, U.S. City Average, for all items (1982-84=100), as published by the Department of Labor, Bureau of Labor and Statistics ("CPI-W") for the year 2009 compared to the average of the CPI-W for the year immediately preceding the date of adjustment.  If the United States Department of Labor

1810522-1

discontinues issuing, or substantially changes the bases of this Index, Sklarco and the Estate of Miriam will substitute and apply prospectively, a different, mutually agreeable index. Likewise, if the parties in good faith discover that the Index does not provide a proper basis for its intended use, the parties will select and prospectively apply a more appropriate index to reflect the effects of inflation/deflation more accurately.

2.3    The "**Aircraft Agency Services Fee**" means the monthly rental payment owed by SEC to Sklar Transport, L.L.C. under that certain Aircraft Lease (the "**Dry Lease**") dated effective as of October 1, 2006, by and between Sklar Transport, LLC, as Lessor, and SEC, as Lessee, as amended, together with other expenses associated with the Aircraft (as defined in the Dry Lease) borne by the Lessee under that Dry Lease, including, without limitation, fuel expenses, salaries, taxes and related personnel expenses associated with salaried pilots, costs for contract pilots, storage at the hanger owned by Sklar Transport, L.L.C. or at other hangers. The Aircraft Agency Services Fee shall be net of any payments received by SEC from individuals for personal use of the Aircraft, including, without limitation, payment received by SEC from the Estate of Miriam for payment of personal use of the Aircraft by Howard F. Sklar and Suzanne S. Simons pursuant to Section 12.3 in Exhibit "B" to the Plan of Reorganization. Until May 1, 2010, the Howard Trust and the Estate of Miriam shared the Aircraft Agency Services Fee in the proportions of 68.75% to Howard Trust and 31.25% to the Estate of Miriam. From and after May 1, 2010, Howard Trust shall bear all of the Aircraft Agency Services Fee. Sklarco agrees with SEC that SEC shall invoice Sklarco for, and Sklarco shall owe, an amount each month equal to the total sum paid by the Principals as Aircraft Agency Services Fee.

2.4    The parties recognize that from time to time sums have been advanced to the Principals by Sklarco, and in the future additional will be advanced to the Principals by Sklarco, to pay expenses of each Principal in connection with the on-going participation of each Principal in the oil and gas business and the development, maintenance and management of the Property of each Principal. As of May 1, 2010, the unpaid balance of the advances made by Sklarco to, and owed to Sklarco by, each of the Principals (the "**Intercompany Debt**") is as follows:

| Principal | Unpaid Balance of Intercompany Debt (as of May 1, 2010) |
|---|---|
| Howard Trust | $ 10,249,544.04 |
| Estate of Miriam/Miriam Sklar L.C. | $  7,100,540.98 |
| Alan Trust | $     326,693.11 |
| Sam Trust | $     488,259.39 |
| **Total Debt** | **$ 18,165,037.52** |

Until the Intercompany Debt owed by a Principal is repaid to Sklarco in full by each Principal, commencing on May 1, 2010, and on the first date of each succeeding month, each Principal shall pay to Sklarco a monthly payment (the "**Interest Agency Services Fee**"), together with such other amounts to be paid in reduction of the principal balance of the Intercompany Debt of such Principal as Sklarco determines to be appropriate. The Interest Agency Services Fee to be made each month by each Principal shall be determined in accordance with the following

1810522-1

formula:

**the product of (the quotient obtained when "PICD" is divided by "Total Debt") multiplied by "BOK Interest and Fees"**

> where,

> **"PICD"** = the unpaid balance of each Principal's Intercompany Debt as of the first of the month in which the monthly payment is due;

> **"Total Debt"** = the sum of unpaid balance of all of the Principals' Incompany Debt as of the first of the month in which the monthly payment is due; and

> **"BOK Interest and Fees"** = the total interest and fees due and payable each month to the Bank of Oklahoma, National Association ("**BOK**"), pursuant to that certain "Credit Agreement" by and between the Sklarco and Sklar Exploration Company, L.L.C., ("**SEC**"), as "Borrowers," and BOK, as Lender, dated January 4, 2008, as amended (the "**BOK Credit Agreement**"), for the month in which the monthly payment is due.

2.5 Sklarco, at its election, shall have the right from time to time to demand and receive from each Principal payment in advance of its respective share of the estimated amount of the expense to be incurred related to the Property during the next succeeding month, which right may be exercised only by submission to such Principal of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 15th day of the next preceding month. Each of the Principals shall pay to Sklarco its proportionate share of such estimate within ten (10) days after such estimate and invoice is received.

2.6 If any Principal fails to pay its share of the statements issued by Sklarco pursuant to Sections 2.1 and 2.5 above within the time period provided, the amount due shall bear interest monthly by means of the Interest Agency Services Fee, provided, however, that at Sklarco's option, in lieu of such Interest Agency Services Fee, Sklarco may charge interest monthly, and each Principal shall bear interest monthly on such amount due, at the prime rate in effect as published in The Wall Street Journal on the first day of the month in which such delinquency occurs plus 1%, or the maximum contract rate permitted by the applicable usury laws of the State of Louisiana, whichever is the lesser, plus attorney's fees, court costs, and other costs incurred in connection with the collection of such unpaid amounts.

2.7 Payment of any invoices issued pursuant to this Agreement shall not prejudice the right of any Principal to protest or question the correctness thereof; provided, however, all invoices and statements rendered to such Principal by Sklarco during any calendar year shall conclusively be presumed to be true and correct after twelve (12) months following the end of any such calendar year, unless within the said twelve (12) month period the Principal takes

1810522-1

written exception thereto and makes claim on Sklarco for adjustment. No adjustment favorable to Sklarco shall be made unless it is made within the same prescribed period.

2.8    Each of the Principals and its auditors, counsel and duly authorized agents, at such Principal's sole expense, shall be entitled at all reasonable times during normal business hours to examine any and all records, reports, accounts, plans, books, correspondence and documents of Sklarco relating to the Property, and, upon notice in writing to Sklarco, shall have the right to audit Sklarco's accounts and records relating to the Property for any calendar year within the twelve (12) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided in Section 2.5. Sklarco shall bear no portion of Principal's audit cost incurred under this Section unless agreed to by Sklarco. Such audit shall not be conducted more than once each year, without the prior approval of Sklarco.

## 3.    Relationship of Parties

3.1    Relationship Between the Principals and Sklarco: The relationship between each of the Principals and Sklarco hereunder is intended to be that of principal and agent, respectively. Nothing contained herein shall be construed so as to constitute the Principals and Sklarco as partners or joint venturers, or either as the employee of the other, or the employees of either as employees of the other.

3.2    Relationship Between the Operator and Sklarco: The relationship between Operator and Sklarco is intended to be that of contractor and owner, respectively.  In consideration of the other terms and provisions of this Agreement, SEC agrees to provide to Sklarco, from time to time, such employees of SEC as "seconded employees" as reasonably necessary for Sklarco to perform its duties hereunder. Nothing contained herein shall be construed so as to constitute SEC and Sklarco as partners or joint venturers, or either as the employee of the other.

## 4.    Term

4.1    This Agreement shall be effective as of May 1, 2010 ("**Effective Date**"), and shall continue in full force and effect for an initial term of two years and thereafter for consecutive one-year terms; provided that either Sklarco or any Principal may elect to terminate this Agreement by giving written notice to the other party at least ninety (90) days prior to the next anniversary date of this Agreement. Upon the proper issuance of such notice of termination, this Agreement shall terminate as to the Principal affected thereby on the next anniversary date of this Agreement, subject to the provisions of Sections 1.3 and 1.4 above.

4.2    Upon the termination of this Agreement for any reason as to any Principal, Sklarco shall prepare, execute and record such assignments to such Principal covering the various interests in the Property which are held by Sklarco as nominee for such Principal pursuant to this Agreement as necessary to transfer record title to the Property to such Principal. All costs of preparing such assignments and recording same in the appropriate public records

1810522-1

shall be invoiced by Sklarco to, and paid by, the Principal. The termination of this Agreement shall be effective as of the date all of such assignments have been recorded in the Conveyance Records of all requisite parishes and counties where the Property is located. Upon the completion of the recordation of such assignments, either party may record a notice of termination of this Agreement in the Conveyance Records of Caddo Parish, Louisiana, which notice shall constitute constructive notice to third parties of the termination of this Agreement.

## 5. <u>Limitations of Liability and Indemnification</u>

5.1 <u>Limitations on Liability</u>. In no event shall Sklarco be liable (whether in contract or in negligence, fault or strict liability) to any Principal, his agents, employees or insurers, arising from claims for any damages of any kind or character (including damages arising from claims by third parties) resulting from performance, nonperformance, or delay in performance of its obligations under this Agreement or from delay, termination or suspension of this Agreement unless such damages shall have resulted from the gross negligence or willful misconduct of Sklarco, its agents or employees.

5.2 <u>Survival of Liability Provisions</u>. The provisions of this Article 5 shall apply to the full extent permitted by law and shall survive termination of this Agreement.

## 6. <u>Miscellaneous</u>

6.1 <u>Notices</u>. All notices and other communications provided for or required by this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or three business days after deposit in the United States mail, return receipt requested, postage prepaid, addressed to the person to whom such notice is intended to be given at the addresses specified below:

    (a)    If to Sklarco:

        Sklarco, L.L.C.
        401 Edwards Street, Suite 1601
        Shreveport, Louisiana 71101
        Attention: David A. Barlow

    (b)    If to any of the Principals:

        Name of Principal
        401 Edwards Street, Suite 16001
        Shreveport, LA 71101
        Attention: Howard F. Sklar

The designation of the persons to be notified, or the addresses of such persons, may be changed at any time by any party upon written notification to the other party.

6.2    Entire Agreement.    This Agreement (together with any Exhibits hereto) constitutes the entire agreement by and between the parties hereto and supersedes any other agreement, whether written or oral, that may have been made or entered into by Sklarco or Principal (or by any officer or representative of such parties) relating to the matters contemplated hereby. Without limitation upon the foregoing, this Agreement replaces and supersedes from and after the Effective Date the Prior Agency Services Agreement.

6.3    Assignment.    Neither Sklarco nor any of the Principals shall assign this Agreement or any interest herein or rights hereunder or delegate any duties hereunder to any person or entity without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld.

6.4    Amendments, Supplements, Etc.    This Agreement or the Exhibits hereto may be amended or supplemented at any time by additional written agreements or exhibits, as may mutually be determined by the parties hereto to be necessary, desirable or appropriate to further the purposes of this Agreement or to clarify the intention of the parties hereto.

6.5    Applicable Law.    This Agreement and the legal relations between the parties hereto shall be governed by and construed in accordance with the substantive laws of the State of Louisiana, without giving effect to the principles of conflict of laws thereof.

6.6    Execution in Counterparts.    This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

6.7    References.    Titles and headings to sections herein are inserted for convenience of reference only, and are not intended to be a part of or to affect the meaning or interpretation of this Agreement. Where the context requires, references to the masculine shall also refer to the feminine or neuter, and references to the singular shall also refer to the plural.

6.8    Severability.    In the event that any of the terms, covenants or conditions of this Agreement or the application of any such term, covenant or condition, shall be held invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other term, covenant or condition hereof and this Agreement shall be construed as if such invalid, illegal or unenforceable term, covenant or condition had never been contained herein.

**DONE AND PASSED** in the Parish of Caddo, State of Louisiana, in the presence of the two undersigned competent witnesses and me, Notary, on this 2nd day of July, 2010, but effective as of the Effective Date set forth in Section 4.1 of this Agreement.

[signatures continued on next page]

**WITNESSES**:

_Vickie M. Deaton_
Vickie M. Deaton

_Melissa Lamberth_
Melissa Lamberth

_Vickie M. Deaton_
Vickie M. Deaton

_Melissa Lamberth_
Melissa Lamberth

_Vickie M. Deaton_
Vickie M. Deaton

_Melissa Lamberth_
Melissa Lamberth

**HOWARD F. SKLAR**, in the
representative capacities for each of the
Principals as identified above
             – Principal

**SKLARCO, L.L.C.**

By: _____
      **DAVID A. BARLOW**
      Vice President - Chief Operating
      Officer

              - Agent

**SKLAR EXPLORATION COMPANY, L.L.C.**

By: _____
      **DAVID A. BARLOW**
      Vice President - Chief Operating
      Officer

              - Operator

_Kim S. Elias_
Notary Public
in and for Caddo Parish, Louisiana.

Kim S. Elias, Notary Public # 52698
Caddo Parish, Louisiana
My Commission is for Life

1810522-1

**EXHIBIT B**

## FIRST AMENDMENT TO AGENCY SERVICES AGREEMENT

## STATE OF COLORADO,

## COUNTY OF BOULDER.

**THIS FIRST AMENDMENT TO AGENCY SERVICES AGREEMENT** (this "Amendment") (the "**Effective Date**") by and among the following:

- **SKLARCO L.L.C.**, a Louisiana limited liability company, whose mailing address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, represented herein by David A. Barlow, its President – Chief Operating Officer ("**SKLARCO**"); and

- **SKLAR EXPLORATION COMPANY L.L.C.**, a Louisiana limited liability company, whose mailing address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, represented herein by David A. Barlow, its President – Chief Operating Officer ("**SEC**" or "**Operator**"); and

- **HOWARD F. SKLAR**, a resident of Boulder County, Colorado, whose mailing address is 5395 Pearl Parkway, Suite 200, Boulder, Colorado 80301, appearing herein in the following capacities (in such capacities hereinafter sometimes referred to as "**Howard**") with respect to the entities, trust relationships and other persons described in the following subparagraphs (i) through (v) (hereinafter sometimes referred to individually as a "**Principal**" and collectively as the "**Principals**"):

  (i) as the Manager of the **MIRIAM SKLAR L.C.** a Louisiana limited liability company;

  (ii) as the Trustee of **HOWARD TRUST** (TIN: 72-6094620), an irrevocable inter vivos trust created under the laws of the State of Louisiana, whose permanent mailing address is Louisiana Tower, Suite 1601, 401 Edwards Street, Shreveport, Louisiana 71101;

  (iii) as the Trustee of **ALAN TRUST** (TIN: 72-6157679), (the "**Alan Trust**") an irrevocable inter vivos trust created under the laws of the State of Louisiana;

  (iv) as the Trustee of **SAM TRUST** (TIN: 72-6131834), (the "**Sam Trust**") an irrevocable inter vivos trust created under the laws of the State of Louisiana; and

  (v) as the duly appointed Independent Executor of the **SUCCESSION OF MIRIAM MANDEL SKLAR** (TIN: 27-6579529), (the "**Estate of Miriam**"), pursuant to that certain order dated April 21, 2010, of the First Judicial District Court, Caddo Parish, Louisiana, Suit No. 540336-B;

and

**HOWARD F. SKLAR**, in his capacity as the Trustee of (i) the **JACOB GRANTOR TRUST** (TIN: 72- 6094619), (the "**Jacob Grantor Trust**"), an irrevocable inter vivos trust created under the laws of the State of Louisiana, and (ii) the **ALAN GRANTOR TRUST** (TIN: 72- 6157679), (the "**Alan Grantor Trust**") an irrevocable inter vivos trust created under the laws of the State of Louisiana (the Jacob Grantor Trust and the Alan Grantor Trust are herein collectively referred to as "**Additional Principals**"); and

who declared that the Principals, the Additional Principals, SEC and SKLARCO have made and entered into this Amendment on the following terms and conditions:

## WITNESSETH

**WHEREAS**, pursuant to that certain "Agency Services Agreement" dated effective May 1, 2010, by and among Howard in the capacities identified above for each of the Principals, SEC as "Operator," and SKLARCO, as "Agent" (the "**Agency Agreement**"), each of the Principals authorized SKLARCO to acquire, hold, develop, maintain and manage various properties and interests on behalf of each such Principal, including, but not limited to, the development, maintenance and management of various oil and gas properties and the acquisition and maintenance of records, accounting, personnel, equipment and legal affairs, with full authority to transact all matters relating thereto, all on the terms and conditions set forth in the Agency Agreement;

**WHEREAS**, effective as of October 16, 2010, the Sam Trust terminated, and pursuant to that certain "Receipt and Release (Sam Trust)" dated effective October 16, 2010, Howard F. Sklar, as Trustee of the Sam Trust, granted, assigned, transferred and delivered unto Jacob Sam Sklar, the sole beneficiary of the Sam Trust, all of the property and assets of the trust estate of the Sam Trust (the "**Sam Trust Property**"), which included of the properties and assets described and listed in Exhibit "A," annexed thereto, and Jacob Sam Sklar inter alia (a) accepted receipt of the Sam Trust Property, and (b) agreed that the interests that are part of the Sam Trust Property held by SKLARCO as "Agent, Nominee" for Howard Fred Sklar, as Trustee of the Sam Trust pursuant to the Agency Agreement would continue to be held by SKLARCO, as nominee in accordance with the Agency Agreement; and

**WHEREAS**, subsequent to the termination of the Sam Trust, Jacob Sam Sklar, as Settlor, and Howard, as Trustee, pursuant to that certain "Inter Vivos Trust (Jacob Grantor Trust)" dated effective as of October 16, 2010, established a new trust to govern all of the Sam Trust Property, and all assets which may thereafter be added to the trust estate of the Jacob Grantor Trust;

**WHEREAS**, effective as of April 21, 2015, the Alan Trust terminated, and pursuant to that certain "Receipt and Release (Alan Trust)" dated effective April 21, 2015, Howard F. Sklar, as Trustee of the Alan Trust granted, assigned, transferred and delivered unto Alan Preston Sklar, the sole beneficiary of the Alan Trust, all of the property and assets of the trust estate of the Alan Trust (the "**Alan Trust Property**"), which included of the properties and assets described and listed in Exhibit "A," annexed thereto, and Alan Preston Sklar inter alia (a) accepted

1871553-1

receipt of the Alan Trust Property, and (b) agreed that the interests that are part of the Alan Trust Property held by SKLARCO as "Agent, Nominee" for Howard Fred Sklar, as Trustee of the Sam Trust pursuant to that certain Agency Agreement would continue to be held by SKLARCO, as nominee in accordance with the Agency Agreement; and

**WHEREAS**, subsequent to the termination of the Alan Trust, Alan Preston Sklar, as Settlor, and Howard, as Trustee, pursuant to that certain "Inter Vivos Trust (Alan Grantor Trust)" dated effective as of April 21, 2015, established a new trust to govern all of the Alan Trust Property, and all assets which may thereafter be added to the trust estate of the Alan Grantor Trust;

**WHEREAS**, SKLARCO, SEC, the Additional Principals and the Principals desire to amend the Agency Agreement (i) to substitute the Additional Principals, the Jacob Grantor Trust and the Alan Grantor Trust, as parties to the Agency Agreement, in substitution and replacement of the Sam Trust and the Alan Trust respectively, as a "Principal," so as to memorialize and formalize the agreement of each Additional Principal as to the authority and power of SKLARCO to serve as the Agent and to perform the services identified in the Agency Agreement on behalf of each of the Additional Principals, and (ii) to ratify all prior acts performed by SKLARCO and/or SEC on behalf of the Jacob Grantor Trust and the Alan Grantor Trust pursuant to the Agency Agreement, respectively, all on the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the premises and of the mutual covenants and agreements contained herein and in the Agency Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the above referenced parties hereto agree as follows:

## AGREEMENT

1. **Substitution of Jacob Grantor Trust as a Principal**. Effective as of as of October 16, 2010, the Agency Agreement is hereby amended to substitute the Jacob Grantor Trust, as a "**Principal**" and one of the "**Principals**," in substitution and replacement of the Sam Trust as a Principal, so that any and all references in the Agency Agreement to either the term "Principal" or the term "Principals" shall refer to the Jacob Grantor Trust. The Jacob Grantor Trust hereby ratifies all prior action taken or performed by SKLARCO and/or SEC pursuant to the Agency Agreement on behalf of said trust from and after October 16, 2010.

2. **Substitution of Alan Grantor Trust as a Principal**. Effective as of as of April 21, 2015, the Agency Agreement is hereby amended to substitute the Alan Grantor Trust, as a "**Principal**" and one of the "**Principals**," in substitution and replacement of the Alan Trust as a Principal, so that any and all references in the Agency Agreement to either the term "Principal" or the term "Principals" shall refer to the Alan Grantor Trust. The Alan Grantor Trust hereby ratifies all prior action taken or performed by SKLARCO and/or SEC pursuant to the Agency Agreement on behalf of said trust from and after April 21, 2015.

3. **Continuing Effect**. Except as specifically amended in this Amendment, all of the terms and conditions of the Agency Agreement shall remain unmodified and in full force and effect.

1871553-1

**DONE AND PASSED** in Boulder County, Colorado in the presence of the two undersigned competent witnesses and me, Notary, on this 31st day of $August$, 2015, but effective as to (i) the Jacob Grantor Trust as of October 16, 2010, and (ii) the Alan Grantor Trust as of April 21, 2015.

**WITNESSES:**

Print Name: _Chris Farrell_

Print Name: _Laura Medlin_

Print Name: _Chris Farrell_

Print Name: _Laura Medlin_

Print Name: _Chris Farrell_

Print Name: _Laura Medlin_

**HOWARD F. SKLAR**, in the representative capacities for each of the Principals and the Additional Principals as identified above

**SKLARCO, L.L.C.**

By: _____
DAVID A. BARLOW
President - Chief Operating Officer
---Agent

**SKLAR EXPLORATION COMPANY, L.L.C.**

By: _____
DAVID A. BARLOW
President - Chief Operating Officer
---Operator

NOTARY PUBLIC in and for
Boulder County, Colorado.
My Commission Expires: _August 15, 2017_

**GEOFFREY DAVID NENNINGER**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 20134051884**
MY COMMISSION EXPIRES AUGUST 15, 2017

1871553-1

**EXHIBIT C**

# SKLARCO LLC
### Distribution Summary

### HOWARD TRUST or HOWARD SKLAR

| | Payment | |
|---|---|---|
| Date | Reference Number | Amount |
| 05/23/16 | 00001139 | 50,000.00 |
| 06/21/16 | 00001145 | 150,000.00 |
| 06/30/16 | 00001147 | 800,000.00 |
| 07/14/16 | 00001151 | 150,000.00 |
| 08/09/16 | 00001154 | 10,000.00 |
| 08/24/16 | 00001159 | 20,000.00 |
| 08/31/16 | 00001160 | 350,000.00 |
| 10/04/16 | 00001169 | 178,000.00 |
| 10/18/16 | 00001173 | 50,000.00 |
| 10/18/16 | 00001174 | 25,000.00 |
| 11/01/16 | 00001176 | 40,000.00 |
| 11/29/16 | 00001183 | 40,000.00 |
| 11/29/16 | 00001184 | 10,000.00 |
| 11/30/16 | 00001185 | 50,000.00 |
| 12/02/16 | 00001187 | 50,000.00 |
| 12/20/16 | 00001190 | 115,871.99 |
| 12/20/16 | 00001197 | 115,871.99 |
| 12/28/16 | 00001194 | 36,000.00 |
| 01/03/17 | 00001195 | 30,000.00 |
| 01/18/17 | 00001198 | 50,000.00 |
| 01/20/17 | 00001200 | 160,000.00 |
| 01/25/17 | 00001202 | 30,000.00 |
| 02/08/17 | 00001206 | 95,000.00 |
| 02/14/17 | 00001208 | 55,000.00 |
| 02/24/17 | 00001212 | 65,000.00 |
| 03/02/17 | 27088 | 53,000.00 |
| 03/09/17 | 00001213 | 75,000.00 |
| 03/14/17 | 00001214 | 30,000.00 |
| 03/27/17 | 00001218 | 95,000.00 |
| 03/30/17 | 00001219 | 28,000.00 |
| 04/18/17 | 00001224 | 325,000.00 |
| 04/20/17 | 00001226 | 20,000.00 |
| 04/25/17 | 00001229 | 40,000.00 |
| 04/28/17 | 00001230 | 125,000.00 |
| 05/02/17 | 00001233 | 175,000.00 |
| 05/23/17 | 00001234 | 25,000.00 |
| 06/05/17 | 00001236 | 175,000.00 |
| 06/27/17 | 00001238 | 10,000.00 |
| 07/03/17 | 00001239 | 112,500.00 |
| 07/13/17 | 00001240 | 60,000.00 |
| 07/17/17 | 00001241 | 45,000.00 |
| 08/01/17 | 00001244 | 175,000.00 |
| 08/31/17 | 00001249 | 115,000.00 |
| 09/13/17 | 28003 | 20,000.00 |
| 10/05/17 | 00001261 | 50,000.00 |
| 10/24/17 | 00001263 | 20,000.00 |
| 11/01/17 | 00001267 | 50,000.00 |
| 11/20/17 | 00001272 | 75,000.00 |
| 11/30/17 | 00001277 | 10,000.00 |
| 12/13/17 | 00001280 | 43,000.00 |
| 12/19/17 | 00001284 | 65,000.00 |
| 12/19/17 | 00001283 | 20,000.00 |

## SKLARCO LLC
### Distribution Summary

### HOWARD TRUST or HOWARD SKLAR

| | Payment | |
|---|---|---|
| Date | Reference Number | Amount |
| 01/09/18 | 00001286 | 60,000.00 |
| 01/24/18 | 00001289 | 179,000.00 |
| 01/26/18 | 00001292 | 100,000.00 |
| 02/07/18 | 00001294 | 80,000.00 |
| 02/09/18 | 00001295 | 100,000.00 |
| 02/26/18 | 00001300 | 20,000.00 |
| 03/14/18 | 00001303 | 45,000.00 |
| 03/20/18 | 00001304 | 45,000.00 |
| 04/26/18 | 00001316 | 135,000.00 |
| 05/07/18 | 00001320 | 40,000.00 |
| 05/22/18 | 00001325 | 50,000.00 |
| 06/07/18 | 00001328 | 15,000.00 |
| 06/15/18 | 00001330 | 75,000.00 |
| 06/22/18 | 00001333 | 500.00 |
| 07/05/18 | 00000007 | 90,000.00 |
| 08/01/18 | 00000015 | 90,000.00 |
| 08/27/18 | 00000019 | 90,000.00 |
| 10/01/18 | 00000032 | 90,000.00 |
| 11/01/18 | 00000041 | 90,000.00 |
| 11/29/18 | 00000046 | 10,000.00 |
| 12/06/18 | 00000047 | 10,000.00 |
| 12/13/18 | 00000050 | 90,000.00 |
| 12/21/18 | 00000053 | 43,288.87 |
| 02/01/19 | 00000058 | 130,000.00 |
| 03/01/19 | 00000065 | 130,000.00 |
| 04/01/19 | 00000071 | 130,000.00 |
| 04/26/19 | 00000074 | 40,000.00 |
| 05/01/19 | 00000075 | 225,000.00 |
| 05/24/19 | 00000078 | 130,000.00 |
| 06/20/19 | 00000079 | 130,000.00 |
| 07/03/19 | 00000086 | 30,000.00 |
| 07/05/19 | 00000089 | 30,000.00 |
| 07/08/19 | 00000082 | 50,000.00 |
| 07/24/19 | 00000087 | 130,000.00 |
| 07/24/19 | 00000088 | 67,654.00 |
| 08/22/19 | 00000092 | 130,000.00 |
| 08/22/19 | 2426 | 70,000.00 |
| 08/29/19 | 00000094 | 10,000.00 |
| 09/03/19 | 00000095 | 200,000.00 |
| 09/10/19 | 00000096 | 30,000.00 |
| 10/02/19 | 00000099 | 190,000.00 |
| 10/29/19 | 00000102 | 11,200.00 |
| 11/01/19 | 00000103 | 100,000.00 |
| 11/27/19 | 00000107 | 20,000.00 |
| 12/04/19 | 00000109 | 180,000.00 |
| 12/31/19 | 00000112 | 25,000.00 |
| 01/03/20 | 00000113 | 125,000.00 |
| | Total: | $ 8,623,886.85 |

**EXHIBIT D**

# SKLARCO LLC
## Distribution Summary

## ALAN TRUST

| | Payment | |
|---|---|---|
| Date | Reference Number | Amount |
| 12/21/16 | 00001191 | 10,000.00 |
| 02/21/17 | 00001210 | 50,000.00 |
| 04/21/17 | 00001227 | 52,952.00 |
| 04/28/17 | 00001231 | 29,687.02 |
| 10/24/17 | 00001265 | 29,687.03 |
| 10/24/17 | 00001264 | 10,490.99 |
| 06/19/18 | 00000002 | 22,499.90 |
| 06/22/18 | 00001332 | 500.00 |
| 07/06/18 | 00000008 | 17,223.75 |
| 07/17/18 | 00000010 | 128,644.00 |
| 08/28/18 | 00000021 | 63,158.36 |
| 09/20/18 | 00000024 | 23,483.15 |
| 10/02/18 | 00000033 | 15,845.74 |
| 12/21/18 | 00000051 | 80,781.68 |
| 02/27/19 | 00000062 | 66,000.00 |
| 04/25/19 | 00000073 | 66,741.97 |
| 05/22/19 | 00000076 | 37,546.69 |
| 07/11/19 | 00000084 | 38,310.19 |
| 08/20/19 | 00000090 | 50,375.09 |
| 08/22/19 | 2432 | 24,311.19 |
| 10/21/19 | 00000100 | 1,620.75 |
| 11/13/19 | 00000105 | 26,967.00 |
| 01/23/20 | 00000117 | 21,249.50 |
| | Total: | $ 868,076.00 |

**EXHIBIT E**

# *SKLARCO LLC*
### *Distribution Summary*

### *SAM TRUST*

| | Payment | |
|---|---|---|
| *Date* | *Reference Number* | *Amount* |
| 12/21/16 | 00001192 | 10,000.00 |
| 01/03/17 | 00001196 | 25,000.00 |
| 02/21/17 | 00001209 | 50,000.00 |
| 04/21/17 | 00001228 | 43,364.00 |
| 04/28/17 | 00001232 | 29,687.03 |
| 08/15/17 | 00001248 | 22,093.32 |
| 10/24/17 | 00001266 | 29,687.02 |
| 06/19/18 | 00000001 | 5,187.27 |
| 06/22/18 | 00001331 | 500.00 |
| 07/17/18 | 00000009 | 128,644.00 |
| 08/28/18 | 00000020 | 57,023.40 |
| 09/20/18 | 00000025 | 16,483.40 |
| 10/02/18 | 00000034 | 8,102.08 |
| 12/21/18 | 00000052 | 70,144.39 |
| 02/27/19 | 00000063 | 49,485.00 |
| 04/25/19 | 00000072 | 48,585.14 |
| 05/22/19 | 00000077 | 32,966.51 |
| 07/11/19 | 00000083 | 28,466.38 |
| 08/20/19 | 00000091 | 46,181.84 |
| 08/22/19 | 00000093 | 24,311.18 |
| 10/21/19 | 00000101 | 1,620.74 |
| 11/13/19 | 00000106 | 26,967.00 |
| 11/27/19 | 00000108 | 8,240.00 |
| 12/30/19 | 00000111 | 4,400.00 |
| 01/23/20 | 00000118 | 21,249.50 |
| 02/27/20 | 00000121 | 10,000.00 |
| 03/04/20 | 00000122 | 8,000.00 |
| | *Total:* | $ 806,389.20 |

**EXHIBIT F**

# SKLARCO LLC

### Distribution Summary

### SMMS TRUST

| Payment | | |
|---|---|---|
| Date | Reference Number | Amount |
| 01/09/19 | 00000060 | 5,000.00 |
| 12/12/19 | 00000110 | 8,680.00 |
| 01/13/20 | 00000115 | 8,000.00 |
| 04/01/20 | 00000127 | 18,000.00 |
| | Total: | $ 39,680.00 |